43 F.3d 1473
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Gregory WILLIAMS, Defendant-Appellant.
 Nos. 93-2487, 93-2488, 93-2576.
 United States Court of Appeals, Sixth Circuit.
 Dec. 15, 1994.
 
 Before: RYAN and SILER, Circuit Judges; and DOWD, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 The defendant, Gregory Williams, appeals the sentences imposed after he pleaded guilty to one count of making false statements to his parole officer, in violation of 18 U.S.C. Sec. 1001, one count of credit card fraud, in violation of 18 U.S.C. Sec. 1929(a)(1), and one count of mail fraud, in violation of 18 U.S.C. Sec. 1341.
 
 
 2
 Williams assigns three errors to the district court's sentencing determination: first, the district court's enhancement of Williams's base offense level under U.S.S.G. Sec. 3B1.1 for his role as a leader or organizer; second, the court's enhancement of Williams's base offense level under both U.S.S.G. Sec. 3B1.1(a), for his role as a leader, and U.S.S.G. Sec. 2F1.1(b)(2), for the offense characteristic of multiple victims; and three, the increase of Williams's Criminal History Category from IV to VI.
 
 
 3
 We conclude that the defendant's assignments of error are meritless, and affirm the sentence imposed.
 
 I.
 
 4
 This is the defendant's second appeal in this case. And, as we have indicated, his assignments of error are addressed exclusively to the sentence imposed. Nevertheless, because of the nature of the defendant's arguments, it is necessary, in order to understand the appeal, that we set forth the underlying facts at some length.
 
 
 5
 On April 17, 1990, a grand jury in the Eastern District of Michigan issued a 39 count second superseding indictment against Williams. The indictment charged Williams with various fraud offenses relating to his operation of United Fidelity Financial Services, a corporation Williams established for the purpose of defrauding the public. Williams pleaded not guilty to the charges laid in the indictment and went to trial. After four days of trial, in which the government presented numerous witnesses, Williams allegedly attempted to commit suicide by ingesting Tylenol. Thereafter, Williams agreed to plead guilty to four of the 39 counts charged, under a Rule 11 Plea Agreement.
 
 
 6
 Williams pleaded guilty to one count of making false statements to his parole officer (Count 1), one count of credit card fraud (Count 15), one count of mail fraud (Count 24), and one count of wire fraud (Count 36). The district court sentenced Williams to 14 years imprisonment.
 
 
 7
 On Williams's first appeal, this court vacated the defendant's guilty plea to the mail fraud count (Count 24), vacated the sentence imposed, and remanded for resentencing. After remand, Williams moved for the dismissal of the wire fraud count (Count 36) because the indictment failed to state an offense. The government conceded that the indictment did not allege an offense under 18 U.S.C. Sec. 1957, so the district court dismissed Count 36.
 
 
 8
 In order to understand the sentence imposed by the district court after remand, and the court's reasons for departing upward from the guidelines, it is necessary to understand the details of Williams's 1985 fraud conviction.
 
 
 9
 On February 7, 1985, Williams was arrested in Oakland County, Michigan, and charged with knowingly passing a nonsufficient funds check over $50. Using an alias, Williams had purchased stereo equipment worth $1,659.76. Following Williams's guilty plea, the state court imposed a one-year suspended sentence because, at the time of sentencing, Williams had already begun to serve a confinement following his federal court convictions for possession of stolen mail, forgery, credit card fraud, and mail fraud. Although these offenses represented three separate schemes Williams had perpetrated during 1983 and 1984, there was a relationship between the stolen mail, forgery, and mail fraud schemes.
 
 
 10
 From November 1983 to January 1984, Williams organized a criminal enterprise using a letter carrier and other persons to steal checks from the United States mail. Williams opened bank accounts under the names of fictitious persons and nonexistent companies and used these bank accounts to negotiate the stolen checks. In three months, Williams negotiated more than 100 checks totalling over $140,000. He was arrested January 27, 1984, when he attempted to cash a stolen $90,000 U.S. Treasury check. Williams convinced the government to delay his prosecution in exchange for information on other mail thieves.
 
 
 11
 The mail fraud count related to Williams's scheme to defraud Gloria McKay and her family. In May 1984, some three months after his arrest for mail theft, Williams posed as "Eric Mason," a broker working for Precious Metals International. Over a period of several months, Williams convinced McKay to "invest" more than $215,000 in nonexistent precious metals. In November 1984, Williams convinced McKay to loan him $63,000 to begin a new "computer chip manufacturing company," and, in January 1985, he convinced McKay to loan him $72,000 to buy a seat on the Chicago Board of Exchange. Williams was able to convince McKay's brother to invest $79,000 and her mother to invest $30,000 in nonexistent silver, and to loan him $100,000 to open a new business. Williams seems to have received at least $559,000 from the McKays between May 1984 and February 1985. This entire scheme took place after the government had arrested Williams for his mail theft scheme and while Williams was allegedly assisting the government's investigation.
 
 
 12
 The credit card fraud count related to Williams's third fraud scheme. On February 7, 1985, Williams was interviewed by United States Secret Service agents who were investigating Williams's fraudulent use of credit cards. Williams used false names and false identification, including false social security numbers, to obtain credit cards. Between August 1984 and February 1985, Williams fraudulently applied for and obtained several credit cards. This was seven months after his arrest for mail theft. Williams made approximately $75,000 worth of transactions with these fraudulently obtained credit cards.
 
 
 13
 The day following the February 7th interview with the Secret Service agents, Williams attempted to complete his mail fraud scheme by withdrawing the last of the funds that he had obtained from the McKays. The bank would not allow him to withdraw the funds because the alias Williams used was not on the signature card for the account. Three days later, Williams's stepfather, who was a signatory on the account, attempted to withdraw the remaining funds after being directed to do so by Williams.
 
 
 14
 Federal agents arrested Williams the next day, February 12, 1985, charging him for the 1983-1984 mail theft scheme, which was the crime in whose investigation Williams was allegedly assisting. When Williams was arraigned on this charge, the magistrate ordered Williams to turn over all of his false identification. Williams did not do this, because one week later he attempted to continue his credit card fraud by negotiating "cash advance" checks using a false state identification card.
 
 
 15
 The government brought one indictment against Williams for these three schemes. In April 1985, Williams pleaded guilty to four of the counts against him. In August 1985, Williams was sentenced to four years imprisonment for mail and credit card fraud, and to ten years for possession of stolen mail and forgery. The court suspended the ten-year sentence and imposed five years of probation, to run consecutively with his four year sentence. The court also ordered Williams to pay $365,000 restitution to the McKays.
 
 
 16
 Confinement in a federal prison did not deter Williams from his fraudulent ways. The criminal activity that underlies Williams's conviction in the present appeal began even before he was sentenced for the 1983-1985 mail theft and fraud schemes. In July 1985, about a month before Williams was sentenced as previously described, Williams wrote to Gloria McKay, who had been his prime victim in the fraudulent precious metals scheme. Playing on the guilt McKay felt after she had convinced her mother and brother to invest several hundred thousand dollars in fictitious silver and fictitious "new business," Williams requested that McKay lend him $10,000 to start up a new investment company. Williams assured McKay that the only way for him to repay her was for her to provide him with funds to begin a business, the profits from which would be used to repay the McKays. This letter included a five page "business outline" detailing wholesale and consumer prices, the individuals who would be doing various jobs, and the necessary capital expenditures. Williams also sent a "Promissory Note," which he had signed, as "security" for the $10,000. McKay sent Williams $4,325.
 
 
 17
 While incarcerated, Williams sent Gloria McKay several letters detailing the progress and setbacks the "new business" had experienced. Of course, all of this was fictional. Williams kept requesting additional "investments" from McKay, pressuring her with predictions that the business might fail if she did not invest additional money. Williams also forged a letter from a prospective "business partner" in an effort to further deceive McKay and to pressure her into sending him more money. Williams told McKay that he had come upon a business opportunity that would yield $1.5 million within three years, and that he was to receive a $500,000 government loan under a special program for ex-convicts. To assure McKay that this was true, Williams forged a letter on Department of the Treasury letterhead.
 
 
 18
 While still in prison, Williams directed his sister to incorporate United Fidelity Financial Services, the corporation he would eventually use as the vehicle for his nationwide fraud scheme. After Williams's release from prison in the fall of 1987, he began to operate United Fidelity. One of the conditions of his parole was that he not be associated with any financial institution. In order to dupe his parole officer, Williams requested assistance from Richard Beyer. Beyer was an employee at World Wide Transportation, which was a trucking company. Beyer supplied false pay stubs to Williams, which Williams then gave to his parole officer, convincing her that he had found legitimate employment. Beyer supplied these false pay stubs from November 1987 to April 1988.
 
 
 19
 Williams's fraud scheme with United Fidelity was large scale. The company had a well furnished office and thirty-six employees, at least three of whom were criminally culpable persons. The fraud scheme had three facets: First, Williams was obtaining as much money from Gloria McKay as possible. He convinced McKay that this money was for "investments" and "loans" so that the business would succeed and Williams could repay McKay. Williams also convinced McKay to cosign loans and credit card applications for business purchases such as office furniture. Williams also used this money to purchase personal items. Williams got as much as $1.3 million from Gloria McKay and her family after his first conviction.
 
 
 20
 The second facet of the United Fidelity fraud scheme was the ostensibly legitimate business of arranging loans. United Fidelity conducted a nationwide advertising campaign asserting that it had access to billions of dollars in credit available for loans. Customers were told that, for a fee, United Fidelity would guarantee that a loan would be made. Customers were told that the fee also paid for "loan enhancements" that would help the prospective borrower get the loans. United Fidelity's "guarantee" was that if no loan were arranged, then the customer's fee would be returned. Government investigators interviewed about forty customers of United Fidelity. No loans were ever arranged and no fees were ever returned. These fees ranged from $2,500 to $50,000. Other fees were obtained from customers by selling them surety bonds to enhance their credit. These "bonds" were forgeries created by a United Fidelity employee.
 
 
 21
 The third facet of the United Fidelity fraud scheme was Williams's tried and true credit card scam. Williams obtained at least seven credit cards using false information. He made purchases with these cards, but never made any payments.
 
 
 22
 Federal agents arrested Williams in January 1989 for his operation of United Fidelity, and his convictions for the offenses involved in this and his previous appeal followed.
 
 II.
 
 23
 Williams's first assignment of error is that the district court should not have assessed four levels under U.S.S.G. Sec. 3B1.1 for Williams's role as a leader or organizer. These levels were added to the mail fraud count (Count 24). Williams argues that under the 1988 sentencing guidelines, the guidelines in effect when Williams committed the offenses of conviction, the defendant must have led other culpable persons in the specific offense of which he was convicted: the court may not examine the defendant's general criminal conduct to determine the defendant's leadership role. Williams claims that there were no other culpable participants for him to lead or organize as to Count 24. The sentencing court's determination that the defendant played a leadership role in the offense of conviction under U.S.S.G. Sec. 3B1.1 is a factual finding that this court should affirm unless clearly erroneous. United States v. Gibson, 985 F.2d 860, 865 (6th Cir.), cert. denied, 113 S.Ct. 2981 (1993). The government has the burden of proving, by a preponderance of the evidence, the facts necessary to the district court's finding as to the defendant's role in the offense. United States v. Barrett, 890 F.2d 855, 867 (6th Cir.1989).
 
 
 24
 U.S.S.G. Sec. 3B1.1(a) provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." This court has held that, in order for section 3B1.1 to apply, the defendant must lead or organize at least one other criminally culpable person. United States v. Carroll, 893 F.2d 1502 (6th Cir.1990).
 
 
 25
 The evidence indicates that Williams extensively organized a very large criminal undertaking and directed the activity of at least four other people who can be counted as culpable persons with regard to the mail fraud charge (Count 24). This charge was based on the fraudulent loan application transactions that United Fidelity conducted. Beyer, Williams's codefendant, supplied false pay stubs to Williams so that Williams could fool his parole officer into believing that Williams had a legitimate job. Beyer did this at the request and under the direction of Williams.
 
 
 26
 Williams argues that this conduct of Beyer can only be considered in relation to Count 1, which charged Williams and Beyer with making false statements to the parole officer. Williams reasons that there was no evidence that Beyer had knowledge of the criminal mail fraud alleged in Count 24. This argument is unconvincing. Beyer provided Williams with false pay stubs knowing that Williams would use these stubs to dupe his parole officer. Whether Beyer knew of the precise nature of the mail fraud that Williams was conducting is immaterial. Beyer was criminally culpable in that he knowingly provided Williams with the means to deceive his parole officer, thus enabling Williams to operate United Fidelity in violation of the terms of his parole.
 
 
 27
 At least three employees of United Fidelity were criminally culpable. Karl Whitner, the "Chief Financial Officer," was the second in command at United Fidelity under Williams. Farooq Azizuddin was the "Chief Information Officer" at United Fidelity. Both Whitner and Azizuddin made fraudulent representations to customers regarding the loan applications. Whitner reviewed all of the potential loans and signed most of the contracts with the clients. For every loan application that resulted in an advance fee being paid to United Fidelity, Azizuddin either travelled to visit the customer or the customer came to visit Azizuddin at the Southfield, Michigan, office. Azizuddin told the clients that he would "enhance" their loan packages. Neither Whitner nor Azizuddin was indicted. Whitner's untimely death just prior to the grand jury proceedings prevented him from being indicted. The Assistant U.S. Attorney decided not to bring charges against Azizuddin because his role was minor and he had apparently not profited much from the criminal enterprise.
 
 
 28
 At least one other criminally culpable person operated under the direction of Williams. Tom Muirhead was employed by United Fidelity. Muirhead created forged surety bonds and attempted to sell them to customers who had already sent in advance fees for loans. Muirhead was not prosecuted because he provided information on the government's assurance that it would not be used against him.
 
 
 29
 Williams argues that the district court improperly relied on the language of the 1990 amendments to the commentary of U.S.S.G. Sec. 3B1.1, which he claims enlarged the scope of section 3B1.1, thus creating an ex post facto increase in his penalty. The evidence of Williams's leadership role in the mail fraud scheme is overwhelming. Even under a narrow interpretation of section 3B1.1, Williams qualifies for a four level enhancement. Thus, there is no need to address the possible ex post facto effect of the 1990 amended commentary. There is abundant justification for the district court's four level enhancement for Williams's role as a leader or organizer.
 
 III.
 
 30
 Williams's second assignment of error is that the district court's finding that he was a leader of an extensive criminal activity, and so eligible for a four level enhancement under U.S.S.G. Sec. 3B1.1, encompassed the facts that support the district court's finding that the fraud involved multiple victims, which increased the base offense level by two under U.S.S.G. Sec. 2F1.1(b)(2)(B). Williams concludes that applying enhancements for both leadership and multiple victims amounts to punishing him twice for the same conduct and therefore violates due process.
 
 
 31
 In reviewing federal guideline sentences, this court applies a clearly erroneous standard of review to the district court's factual findings, and, while giving due deference to the district court's application of the guidelines to those facts, it renders de novo review of the court's legal conclusions. United States v. Garner, 940 F.2d 172, 174 (6th Cir.1991).
 
 
 32
 The language of U.S.S.G. Sec. 3B1.1 is quoted above. Section 2F1.1(b)(2) relates to enhancements for specific offense characteristics for violations involving fraud or deceit. U.S.S.G. Sec. 2F1.1(b)(2) provides that "[i]f the offense involved (A) more than minimal planning, or (B) a scheme to defraud more than one victim, increase by 2 levels."
 
 
 33
 Williams primarily relies on United States v. Romano, 970 F.2d 164 (6th Cir.1992). In Romano, a divided panel of this court held that applying both an enhancement for leadership of an extensive criminal activity under U.S.S.G. Sec. 3B1.1 and an enhancement for more than minimal planning under U.S.S.G. Sec. 2F1.1(b)(2)(A) violated due process because it amounted to punishing a defendant twice for the same conduct.
 
 
 34
 This court has rejected the Romano rationale as applied to an enhancement under section 3B1.1 for leadership and section 2F1.1(b)(2)(B) for multiple victims. United States v. Aideyan, 11 F.3d 74 (6th Cir.1993). Williams complains that Aideyan was poorly reasoned. We reject that argument. We may not overrule Aideyan. That case is directly on point and controls our resolution of this issue.
 
 IV.
 
 35
 Williams's third assignment of error is that the district court unreasonably raised his Criminal History Category from IV to VI by considering his 1985 federal fraud conviction as if it had been three separate felony convictions. When reviewing a district court's decision to depart upward from the sentencing guidelines, this court has held that 18 U.S.C. Sec. 3742(e) requires a threefold analysis. We must decide: (1) whether the circumstances relied upon by the district court do in fact justify an upward departure, a question of law reviewed de novo; (2) if the circumstances relied on by the district court do warrant an upward departure, whether those circumstances exist in the present case, a question of fact to be reviewed for clear error; and (3) whether circumstances were present that warranted an upward departure, a matter we review for reasonableness. United States v. Rodriguez, 882 F.2d 1059, 1067 (6th Cir.1989), cert. denied, 493 U.S. 1084 (1990).
 
 
 36
 The Presentence Report (PSR) placed Williams in Criminal History Category IV, based on the PSR's calculation of 7 criminal history points. Williams received 1 point for his 1985 state bad check conviction; 3 points for his 1985 federal conviction; 2 points for committing the present offense while on probation; and 1 point for beginning his participation in the present offense while incarcerated and continuing it after his release.
 
 
 37
 When the trial court considered the 1985 conviction as three felony convictions, the point total became 13, because the 1985 conviction now counted for 9 rather than 3 points. Thirteen points or more equal Criminal History Category VI.
 
 
 38
 The trial court sentenced Williams to the maximum sentence based on offense level 23 and Criminal History Category VI, which is 115 months. The court ordered this term to be served concurrently with the ten year term imposed earlier for Williams's parole violations. The district court also imposed a five year term for making false statements to the parole officer and ordered that that term be served consecutively to the ten year term imposed earlier.
 
 
 39
 On appeal, Williams admits, as he must, that the circumstances relied upon by the court to depart upward are proper circumstances for an upward departure and are not taken into consideration by the guidelines. Thus, the first requirement of the Rodriguez analysis is satisfied. However, Williams attacks the court's decision to depart upward on other grounds: (1) if the district court considered his 1985 conviction as more than one criminal episode, it should have counted it as two episodes, not three; and (2) the district court's upward departure was unreasonable.
 
 
 40
 The finding that the 1985 conviction represented three separate criminal episodes rather than one or two is a finding of fact that this court reviews for clear error. Williams's argument that the conviction should have counted only as two episodes is primarily based on his reading of U.S.S.G. Sec. 4A1.2, comment. (n. 3).
 
 
 41
 Application Note 3 gives an example of a situation in which an upward departure is probably warranted. The example is of a defendant whose previous conviction represented distinct criminal episodes separated by arrests but combined into one trial for convenience. Williams attaches utmost significance to the example's discussion of episodes separated by arrests. Because the 1985 conviction represented criminal episodes separated by only two arrests, Williams suggests that his 1985 conviction can only be counted as two convictions. This argument is without merit. Nothing in the commentary suggests that the example it sets out is limiting or binding; it is nothing more than an example. That Williams's case does not perfectly match the example does not preclude the district court from finding that the 1985 conviction represented three distinct criminal episodes.
 
 
 42
 Williams's second attack on the upward departure is that it was unreasonable. He complains that the district court "bootstrapped" the parole violation sentence of ten years imprisonment, making it a 3 point felony conviction when it was originally a suspended sentence of probation which, even if counted separately, would only be worth 1 point. Adding 1 point for the suspended sentence and 3 points for the additional felony conviction would have only resulted in 11 total criminal history points, thus putting Williams in Criminal History Category V. It suffices to say that the district court acted entirely within its discretion in reaching Category VI in the fashion it did. Williams attempts to bolster his unreasonableness claim by arguing that United States v. Downs, 955 F.2d 397 (6th Cir.1992), and United States v. Kennedy, 893 F.2d 825 (6th Cir.1990), require that before departing upward for criminal history, the district court must consider on the record why the next higher category (V in this case) would not be appropriate. This argument results from Williams's overly broad reading of those cases.
 
 
 43
 In Kennedy, the district court sentenced the defendant to 180 months when the guideline range was 77 to 96 months. The district court did not elaborate on why the guidelines were inadequate, but rather based its decision on what it perceived as the need to keep the defendant away from society for a very long time. In Kennedy, the defendant was at Criminal History Category V; Category VI would have resulted in a range of 84 to 105 months. This court reasoned that the district court had committed two errors: not adequately stating reasons for departure and not demonstrating that it had looked to the next higher level for guidance.
 
 
 44
 Downs involved a defendant who was already at Category VI, so no higher category existed. The district court greatly increased the defendant's sentence, from 46 months to 120 months, with only a conclusory statement that the guidelines inadequately represented the defendant's criminal history. This court reversed the sentence, stating that the district court must articulate specific reasons for an upward departure on the record.
 
 
 45
 Both Downs and Kennedy involved departures beyond Category VI with no adequate explanation for the upward departure. The mischief that this court sought to avoid in those cases was large upward departures from the guidelines without adequate explanation. An inadequate explanation from the district court means that an appellate court has no basis upon which to review the district court's exercise of discretion.
 
 
 46
 In the present appeal, the district court articulated on the record why it felt the guidelines were inadequate and then recalculated the sentence range based on the higher Criminal History Category. The sentence imposed by the court was the maximum allowed within the range for Category VI. The district court's actions here do not reflect the mischief that this court has prohibited: the district court created a record and reasoned its way to the sentence imposed. This court may readily review the district court's exercise of discretion.
 
 
 47
 Kennedy did not create a per se rule to be incanted by district courts before departing upward beyond the next higher Criminal History Category. Once the district court found that Williams's 1985 conviction represented three separate criminal episodes, the arithmetic of the guidelines led to Criminal History Category VI. Stopping at Category V would have been arbitrary.
 
 
 48
 We conclude that the district court's finding that Williams's 1985 conviction represented three separate criminal episodes was not clear error. We also conclude that the district court's recalculation of Williams's criminal history points in light of this finding was reasonable.
 
 V.
 
 49
 We have reviewed the claims raised in the defendant's pro se brief that the district court erred by not imposing concurrent sentences and violated the Double Jeopardy clause of the Constitution by sentencing the defendant for crimes previously used to revoke probation, and find them to be without merit.
 
 VI.
 
 50
 Because we have concluded that Williams's assignments of error are without merit, the sentence imposed by the district court is AFFIRMED.
 
 
 
 *
 The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation