**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 05a0748n.06**
**Filed: August 25, 2005**

**Case No. 03-5763**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| DAVID I. NAMER, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| | ) | |

**BEFORE: NELSON and BATCHELDER, Circuit Judges; O'MALLEY[*], District Judge.**

**ALICE M. BATCHELDER, Circuit Judge.** Defendant-Appellant David Namer

("Namer") appeals his conviction and sentence for ninety-four counts of conspiracy, securities fraud,

mail fraud, wire fraud, money laundering, and tax evasion, and a separate count of criminal

forfeiture. For the following reasons, we affirm Namer's conviction in all respects, but remand his

case for re-sentencing.

**BACKGROUND**

**A.      The Issuance of Private Placement Corporate Notes**

_____

[*]The Honorable Kathleen M. O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

After his release from prison following a 1980 conviction for wire fraud, Namer moved to Memphis, Tennessee, where he began a scheme to raise funds for cash-strapped companies with no credit. The scheme involved issuing unregistered corporate notes, known as private placements. These private placements, which would be marketed and sold across the country by licensed security dealers, are not rated by any quality-control organization and are thus high risk.

Namer hired attorney Larry Baresel to prepare the Private Placement Memoranda ("PPM's") and to serve as bond counsel during closings. On most of the note issuances Namer planned he was the primary control person, but since Baresel told him that listing himself as control person would require Namer to disclose his prior fraud conviction, Namer never disclosed himself as primary control person in any of the PPM's.

In 1993, Namer recruited Craig Colwell, a licensed broker at Sutter Securities ("Sutter"), to sell Namer's private placement notes. Colwell informed Namer that no one would purchase his notes without some form of insurance (a "financial guarantee"). This presented a problem for Namer because any potential insurer would want to conduct due diligence, which Namer's corporations would not withstand.

**B.      Namer's Bribery of Richard Quackenbush**

To solve his due diligence problem, Namer entered into a relationship with Richard Quackenbush, a vice-president for Universal Bonding Company ("Universal") in New Jersey. Universal's business was issuing performance bonds, which essentially acted as financial guarantee (insurance) bonds, and Quackenbush was in a position to influence whether such bonds were issued. In January 1994, Quackenbush issued a series of performance bonds for Namer's companies. These

2

guarantees would normally have required collateral equal to the full coverage amount of the bonds, but Namer did not have the collateral, so Universal issued the bonds anyway at a $50,000 premium.

In February 1994, Namer asked Quackenbush for additional bonds without collateral, which Quackenbush approved. Later that month, Quackenbush asked Namer for a $50,000 loan to use in a personal investment. Namer gave him the $50,000 in two checks, making no provision for repayment. A few days later Namer also gave Quackenbush $400 in cash that the latter implied he would accept as a bribe.

Quackenbush continued to approve millions of dollars of performance bonds in violation of Universal's underwriting requirements and without requiring any collateral. The bribes continued as well. Namer helped Quackenbush create an offshore company ("RJJJ") to which Namer sent $34,959.46 in checks. In October 1994, Quackenbush sent Namer a fax asking him to pay Quackenbush's home mortgage, and over a two-year period thereafter, Namer funneled $36,154.91 from one of his companies to pay Quackenbush's mortgage.

This scheme resulted in Quackenbush's issuing $17 million in performance bonds for Namer's companies. Namer never pledged any collateral for these bonds, which ultimately cost Universal and its re-insurer $7.75 million. Namer also never informed any of his investors that their notes were backed up by fraudulently obtained bonds.

## C.    Namer's Bribery of Craig Colwell

Once Namer had obtained the performance bonds, Colwell could market Namer's notes. Over the course of a year and a half, Namer made $90,000 in under-the-table payments to Colwell, who sold over $22 million of Namer's notes to investors. None of the payments to Colwell was ever disclosed to Colwell's employer (Sutter) or its clients, or in the PPM's prepared by Namer and

3

Baresel for prospective investors. The payments to Colwell for selling notes began in January 1994, which coincided with the beginning of Namer's bribery of Quackenbush in return for his issuing bonds as insurance. The whole scheme ended up costing Sutter $1.2 million, because when the notes went into default Universal refused to pay under some of the performance bonds.

**D.      Namer's Bribery of Bruce Barbers**

Namer engaged in a similar bribery arrangement with Bruce Barbers of the New York-based brokerage firm Meyers, Pollock, Robbins ("MPR"). As an MPR broker, Barbers sold over $1.5 million in notes for Namer; in return, Namer made $141,155 in corporate check and wire payments to an account held by Barbers under another name. These payments were never disclosed to any purchasers of the notes.

**E.      Namer's Falsely Representing That Notes Were Insured**

Meanwhile, an audit at Universal revealed problems with performance bonds issued to Namer, causing Quackenbush to resign in March 1995. This development left Namer without a source of performance bonds for his note issues. Namer's Ponzi scheme required issuing additional notes to pay off prior note obligations. Without new note issues, Namer would default on principal and interest payments on old ones, and his scheme would be discovered.

After leaving Universal, Quackenbush joined another firm, National Surety Specialists. In mid 1995, Namer contacted Quackenbush and succeeded in getting National Surety to issue "consents of surety" for some of his companies. "Consents of surety" are not actual performance bonds insuring the notes, but merely commitment letters from insurance companies to issue insurance if they receive the appropriate collateral. No insurance was ever issued, however, because

4

Namer never provided the requisite collateral; his intent all along was to use the consents of surety to trick investors into believing his notes were insured when they were not.

Namer needed more consents of surety than he could get from National Surety, which led Quackenbush to introduce Namer to Fred Smith, who owned Associated Insurance Agency, an insurance brokerage firm in Boston. Smith issued several consents of surety from Ranger Insurance Company, which Ranger never knew of or approved.

Smith gave Namer consents for $18 million in insurance, but both men realized Namer could never provide the $18 million in collateral necessary actually to obtain the insurance and only wanted documents to make it look as if he had failsafe insurance commitments. Therefore, Namer indicated in his PPM's that he had irrevocable and unconditional insurance commitments. When brokers or potential investors asked to see the consents of surety, Namer simply whited out the collateral condition from the letters, and then faxed the apparently unconditional consents to the relevant inquirers.

Namer sent such forged documents to various brokers trying to verify his insurance, the trust company overseeing the bond offerings, and any investors attempting to verify the insurance. Meanwhile, Smith agreed to vouch for the forged consents of surety when inquiries were made to him, which led brokers and investors to believe mistakenly that Namer's notes were insured. On the occasions when interested parties wanted to see actual copies of the performance bonds, Namer forged them. When they wanted to contact Ranger to verify insurance, Namer told them they were not allowed do so and that he would verify it for them.

**F.     Namer's $6 Million Sales of Unauthorized Ray and Ross Notes**

5

Namer also sought to generate legitimate revenue by entering into a contingent agreement to purchase Ray and Ross Transport, Inc. ("Ray and Ross"), a Las Vegas bus line, from Sammie Armstrong, who had owned and operated Ray and Ross for over twenty years. Since Namer's operating the bus line required approval of the Nevada Public Service Commission ("PSC") (based on a check of the bus line's finances), the sale was expressly conditioned on his obtaining such approval. Therefore, Ray and Ross's stock was placed in escrow and Armstrong maintained control of the company's Board of Directors pending Namer's obtaining PSC approval. As it turned out, Namer never obtained this approval, and thus never gained legal control of Ray and Ross.

Nonetheless, in February 1996, Namer caused $6 million in notes to issue on behalf of Ray and Ross, without the knowledge of the company's Board, which wrecked the already struggling company's financial reputation and assured that Namer would never get the PSC approval necessary to effectuate the purchase. Namer and Baresel created a bogus PPM to market the Ray and Ross notes. Namer had the necessary documents signed by a Steven Slade, who represented himself as president of Ray and Ross, but who actually held no position at the company. Thus, Namer essentially sold worthless pieces of paper to investors. Moreover, he falsely represented in the PPM that these non-existent notes were insured, and when investors and brokers requested copies of performance bonds, Namer sent them counterfeit bonds. Baresel informed Namer at the time that the Ray and Ross scheme was criminal fraud.

## G. Namer's Fraudulent Northstar Notes

Namer also obtained control of a failing Las Vegas commuter airline, Tri-Star Airlines, and sold Tri-Star notes to investors. He engaged in negotiations with Northwest Airlines to make Tri-Star a commuter airline for Northwest, and eventually changed Tri-Star's name to Northstar Airlines

in hopes of reaching such a deal.  In May 1996, Namer caused Northstar to issue $6.2 million in notes, ostensibly for Northstar's startup costs.  Namer falsely represented in the PPM's and other communications that the Northstar notes were fully insured and that Northstar had a tentative contract with Northwest.  No such contract ever existed with Northwest, which broke off negotiations with Namer by sending him a "drop dead" letter upon learning of his 1980 federal felony conviction.

Although Namer had sold millions of dollars worth of Northstar notes prior to receiving this letter, he never informed purchasers that there would be no revenue from which to make interest and principal payments on the notes.  Even worse, weeks after receiving the "drop dead" letter, Namer sold $1.5 million in notes to the Seventh Day Adventist Church.  He falsely represented that the deal with Northstar was still alive, and the church lost its entire investment.

## H.    Namer's Fleecing of Gabriel Elias

In late 1995, Namer solicited an investment in Tri-Star notes from Gabriel Elias, an elderly investor in Pennsylvania who was attracted to the investment because of its high rate of return and insured notes.  Namer gave Elias a PPM and fake performance bonds that convinced him the notes were insured.  Namer also had Fred Smith (or his son, Tim) falsely verify to Elias that the Gulf Insurance Company was prepared to issue performance bonds on order.  Later, after the notes were defaulted, Elias contacted Smith again and the latter admitted he was not affiliated with Gulf Insurance.  Elias lost just under $2 million of his $2,150,000 investment in Tri-Star.

## I.    Namer's Diverting Ray and Ross and Northstar Note Proceeds to Buy MPR

Since Namer constantly needed brokers to market his notes, he purchased an interest in the brokerage firm Meyers, Pollack, Robbins.  Namer purchased a fifty percent interest in the firm for

7

$2 million, which required him to divert revenue from the sale of Ray and Ross and Northstar notes to buy MPR. This diversion was not disclosed to Ray and Ross and Northstar noteholders, who had been led to believe their investment would be used to benefit those companies, not for one of Namer's personal investments.

**J.      Namer's Tax Evasion**

Namer evaded approximately $209,568.50 in federal income taxes from 1994 through 1996. He did this in part through corporate diversion–paying personal expenses from the accounts of his companies. Namer also concocted an elaborate scheme to make his home mortgage payments with unreported income, which involved representing his mother in Panama as the home's owner, issuing corporate checks to his step-father Nissim Russo, forging Russo's signature, and depositing the forged checks in the account of the mortgage holder (one deposit even occurred after Russo's death).

**K.      Proceedings Below**

On September 28, 2000, Namer was indicted for ninety-four counts of securities fraud, mail fraud, wire fraud, money laundering, and tax evasion, and a separate count for criminal forfeiture. Because of the complexity of the case and the large volume of documents involved, Namer and his defense team were provided the use of a suite of offices in the courthouse for preparation, electronic copies of all of the government's documents and exhibits, access to make paper copies of these documents, two court-appointed attorneys at trial, two experts, a paralegal, six document examiners, and private investigators. Namer was detained during the twenty-one-month period prior to his trial because the district court found that he posed a flight risk; nonetheless, he was transported three times a week by federal marshals to his defense team's offices in the courthouse to allow him to work with his counsel to prepare his defense.

8

During a seven-week trial, the government presented sixty-six witnesses and introduced over 1400 exhibits. On August 20, 2002, the jury returned guilty verdicts on all ninety-four counts, and found for the government on the criminal forfeiture count. On May 30, 2002, Namer was sentenced to 350 months' imprisonment and five years supervised release. He was also ordered to pay restitution of $32.7 million and to forfeit $34.65 million.

## ANALYSIS

Namer presents a litany of challenges to his conviction, all of which are meritless. Namer's brief is not a paradigm of clarity and organization, but we have done our best to make sense of each of his arguments, and we address them below.

I.     **Namer's Claims Regarding His Pre-Trial Incarceration, Access To Documents, And Representation By Counsel**

A.     **Fifth And Sixth Amendment Rights To A Fair Trial**

Namer seems to argue that his pre-trial detention from September 2000 until his trial in July 2002, standing alone, violated his right to due process. Namer was denied bond by the district court, and a unanimous panel of this court held that the government had met its burden of showing by a preponderance of the evidence that Namer presented a flight risk. *See United States v. Namer*, No. 00-6427, 2000 WL 1872012, at *1 (6th Cir., Dec. 12, 2000). Namer seems to suggest on appeal that when it made its decision the prior panel of this court did not know that it would be nearly two years before he would come to trial, or that his case would be so complex. It is clear to us, however, that the delays in Namer's trial were primarily of his own making, and the panel's earlier opinion clearly states that he was faced with a "complex 94-count indictment." *Id.* Moreover, the length of Namer's detention and complexity of his case do not affect the fact that Namer posed a risk of flight, as found by the prior panel. Namer may not re-litigate this issue in a subsequent appeal.

9

On a related note, Namer argues that the circumstances surrounding his pre-trial detention limited his ability to meet with his attorneys and examine documents in order to aid them in preparing his defense. These limitations, he complains, prevented him from obtaining a fair trial and violated his Fifth and Sixth Amendment rights to due process and counsel. Namer's arguments that he was forced to go to trial unprepared are similar to a defendant's appeal from denial of a motion for continuance on Fifth and Sixth Amendment grounds, which we review for abuse of discretion. *See United States v. Crossley*, 224 F.3d 847, 854-55 (6th Cir. 2000). To show reversible error the appellant must demonstrate actual prejudice–that a delay in the proceedings "would have made relevant witnesses available or added something to the defense." *Id.* at 855. Namer is able to show neither a constitutional violation nor actual prejudice.

The district court did not abuse its discretion in balancing Namer's right to a fair trial with the state's legitimate interest in detaining a defendant accused of serious crimes who poses a flight risk. Two attorneys were appointed pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A, to represent Namer at trial. Namer was provided his own four-room suite of offices in the courthouse for his defense team, computers and software, a computer litigation expert, a paralegal, private investigators, six document examiners, two securities experts, and $37,000 worth of copying services. The government took the unusual step of transporting Namer to the courthouse three days a week for thirteen months to enable him to meet with his attorneys and review documents in preparation of his defense, and Namer was free to meet with his counsel on weekends at his detention facility. Namer's two trial attorneys spent over 4,000 hours conducting his defense, racking up $537,646.25 in C.J.A. fees. Namer argues that the government's failure to give him paper copies of all the documents seized from his office violated his rights, but this claim is

10

meritless. Namer was clearly given reasonable access to all of these documents.[1] In light of the extraordinary measures taken to ensure Namer's right to a fair trial, it comes as no surprise that he is unable to identify any actual prejudice in the form of witnesses, documents, or issues overlooked by counsel. His fair-trial claims clearly fail. *See Crossley*, 224 F.3d at 854-55.

### B. Access To Documents Under The Federal Rules Of Criminal Procedure

Namer also argues that his lack of access to his documents violated Fed. R. Crim. P. 16, which requires the government to "permit the defendant to inspect and to copy" documents in its possession. We review a district court's discovery rulings for abuse of discretion, *United States v. Quinn*, 230 F.3d 862, 866 (6th Cir 2000), and there was certainly no abuse of discretion in Namer's case. He not only had physical access to all relevant documents, but every seized document was provided to him on CD-ROM. *See supra* note 1.

### C. Sixth Amendment Right To Counsel

Namer argues that the district court's refusal to replace his trial counsel, Clifton Harviel, violated his right to counsel. Namer contends that irreconcilable differences existed between Harviel and him mandating that the court grant him new counsel, and that in the alternative he should have been allowed to proceed pro se. We review a district court's denial of a motion for substitution of counsel for abuse of discretion. *See United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996).

---

[1]Namer's counsel was given CD-ROMs of all the seized documents early in the process. Moreover, Namer's counsel had physical access to all the documents and the ability to make any relevant copies, and the government put in place a procedure to protect defense work product privileges should Namer's counsel have chosen to make copies. Finally, eight months before trial the government designated the documents it intended to use at trial, thus reducing over 100 boxes to a mere 6 boxes. The documents were pre-marked with exhibit numbers and placed in the order the government planned to introduce them at trial.

A defendant with appointed counsel has no right to substitution of counsel absent a showing of "good cause." *See id.* at 148; *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1993). The defendant's mere loss of confidence in his counsel does not establish "good cause." *See Young*, 482 F.2d at 996. A defendant can only succeed in demonstrating "good cause" for substitution by showing a total lack of communication with his attorney resulting in an inadequate defense. *See Jennings*, 83 F.3d at 148. In examining a defendant's request for substitution of counsel, the court must balance the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice. *Id.*

We note that Namer has had ten attorneys appointed to represent him throughout the process from indictment to appeal, several of whom were forced to withdraw because they could not get along with him. *Cf. United States v. McLeod*, 53 F.3d 322, 325-26 (11th Cir. 1995) (refusing to appoint defendant new counsel to replace withdrawn counsel because defendant had forfeited his right to counsel by verbally abusing him). Namer correctly notes that the district judge made a finding of "irreconcilable differences" between Namer and Harviel, but the judge also praised Harviel for his competence and candor, saying he "exemplifies what we want attorneys to exemplify." In addition, it appears that much of Namer's frustration with Harviel resulted from Harviel's candid judgments about the unlikelihood of Namer's obtaining an acquittal on all counts, a completely valid and laudable effort by an appointed defense counsel. *See McKee v. Harris*, 649 F.2d 927, 932 (2d Cir. 1981) (noting that counsel has a duty to give a "realistic assessment" of defendant's case); *see also Brown v. United States*, 264 F.2d 363, 369 (D.C. Cir. 1959) (en banc) (Burger, J., concurring in part) (noting that it is counsel's duty to give defendant an "honest appraisal" of his case so that defendant can make an "informed judgment" about whether to enter

12

into plea negotiations, and that counsel has "no duty to be optimistic when the facts do not warrant optimism"). Moreover, the district court was rightly concerned with simply dismissing Harviel, which would have pushed the trial back another twelve to eighteen months while another attorney got up to speed. Finally, Namer makes no specific allegation of error by his counsel that in any way might have affected the result of his trial.

Given all these considerations, we think the district judge fashioned a reasonable compromise between Namer's right to be represented by someone with whom he did not have "irreconcilable differences" and the public's interest in the reasonably prompt administration of justice. The judge elevated Namer's second-chair trial counsel, Robert Little, to first chair and kept Harviel on the case in an advisory capacity. This tactic allowed the defense team to preserve Harviel's unique knowledge of the documents and the case in general, while elevating to lead counsel an attorney with whom Namer had a pleasant working relationship. Most important, at the time when the judge made this decision–when Namer knew both Little and Harviel and what it was like to work with each of them–Namer himself indicated that such an arrangement could "be accommodated" and "would work very comfortably." Therefore, Namer received the representation of a competent team of lawyers, and he was able to communicate amicably with at least his lead attorney. Under these circumstances, we certainly do not believe that the district court abused its discretion in its handling of Namer's apparent inability to get along with practically every attorney provided him.[2]

_____

[2]In fact, in reviewing the extensive record in this case, we were impressed by the remarkable degree of patience that Judge Donald displayed in dealing with Namer's frequent and ever-changing demands.

13

Namer also mentions his moving to proceed pro se on the eve of trial, although he does not make a comprehensible argument regarding this issue. It appears that the district judge conditionally granted Namer's motion, recognizing that a defendant has a constitutional right to represent himself, but that Namer voluntarily chose not to proceed pro se after being warned of the risks of doing so in such a complex case. We conclude that the district court handled this matter properly.

## II.     Namer's Claims Regarding A Right To Expert Assistance

Namer also argues that the district court violated his Sixth Amendment right to counsel when the court refused to grant a continuance of the trial until after an expert's surgery to enable the expert to be present at trial to sit at counsel's table with Namer. We review for abuse of discretion a district court's refusal to grant a continuance. *Crossley*, 224 F.3d at 854-55. Denial of the continuance amounts to a constitutional violation "only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Id.* at 855. Moreover, even if Namer's Sixth Amendment rights were violated, to show reversible error, he must show actual prejudice from denial of the continuance. *United States v. Gallo*, 763 F.2d 1504, 1523 (6th Cir. 1985).

It became apparent two months prior to trial that Michael Roberts, Namer's Fed. R. Evid. 615 securities expert, would not be available for trial due to a sudden need for surgery. Namer requested a four-month continuance so that Roberts would be physically available. The trial judge noted the incredible burden that moving the trial at the last minute would create: a three to four month period was already blocked out on the court's schedule for the trial, witnesses had already made plans to appear, there had already been numerous continuances in the case, and Namer's lead counsel (Little) was on a tight schedule because he intended to move from the area immediately after

14

trial. The district judge noted that trial was scheduled to occur near the end of Roberts's recovery period, meaning that he would be sufficiently healthy to work on Namer's case, even if he were not able to be physically present in the courtroom. The court authorized payment for daily trial transcripts for Roberts, allowing him to review them and offer advice without having to be physically present at trial. Furthermore, Namer had significant access to at least two other securities experts, one of whom Namer refused to call at trial, and one of whom spent over $71,000 worth of time on Namer's case.

Namer cites no authority granting him a Sixth Amendment right to an expert. His best Sixth Amendment argument is that his counsel, Mr. Harviel, opined offhandedly to the judge that he would be "constitutionally ineffective" without the benefit of a securities expert.[3] As shown above, however, Namer had ample assistance from at least three securities experts–Roberts, Tucker, and McAuliffe. Namer offers no evidence of specific prejudice to support his claim of reversible error, and we cannot say that the district court abused its discretion in denying Namer's motion for a continuance so that Roberts could be physically present.

## III. The Re-opening Of The Government's Money Laundering Case

Namer argues that the district court's allowing the government to re-open its money laundering case was error. The decision to re-open the proof is committed to the sound discretion of the trial judge. *United States v. Blankenship*, 775 F.2d 735, 740 (6th Cir. 1985). "Reopening is often permitted to supply some technical requirement . . . or to supply some detail overlooked by inadvertence." *Id.* "The most important consideration is whether the opposing party is prejudiced

---

[3]Harviel was not actually making an ineffectiveness argument to the court, however, and in the same hearing before the court, lead counsel Little made clear to the judge that he believed the defense team was adequately prepared for the upcoming trial.

15

by reopening." *Id.* at 741. "Where . . . reopening is permitted after the government has rested its case in chief, but before the defendant has presented any evidence, it is unlikely that prejudice sufficient to establish an abuse of discretion can be established." *Id.*

The government sought to re-open its proof on the money laundering counts, before Namer had put on any of his evidence, for the limited purpose of introducing FDIC certificates to prove an effect on interstate commerce. *See* 18 U.S.C. §§ 1956, 1957. Contrary to Namer's assertion that this saved the government's case, however, the record already contained evidence of effect on interstate commerce, including all the monthly statements and checks introduced as exhibits, which stated that the banks were FDIC-insured. The government's purpose in seeking to re-open proof to introduce the FDIC certificates was merely to make the proof of interstate commerce more easily digestible for the jury.

Failure to introduce the FDIC certificates in the first instance was clearly an inadvertent technical mistake. *See Blankenship*, 775 F.2d at 740. The most important consideration is whether Namer was prejudiced by the re-opening, and prejudice is unlikely where, as here, the re-opening occurred before Namer had offered any of his proof in the case. *See id.* at 741. Furthermore, Namer has offered no specific evidence or allegation of prejudice via unfair surprise. The district court did not abuse its discretion in allowing the government to re-open its proof.

IV.    **Speedy Trial Act**

Namer makes several arguments under the Speedy Trial Act ("STA"), 18 U.S.C. § 3161, which essentially gives a defendant the right to have his trial commence within seventy days after indictment or his appearance before a judicial officer, whichever is later. We review the district court's application of the STA de novo. *United States v. Salgado*, 250 F.3d 438, 453 (6th Cir. 2001).

16

First, Namer argues that several weeks during October and November of 2000 were improperly excluded from his seventy-day STA clock because this delay was not a result of his preparing for trial, but resulted instead from his counsel's withdrawing and having to be replaced. The STA, however, clearly exempts from calculation "[a]ny period of delay resulting from other proceedings concerning the defendant," including "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on . . . such motion," and exempts "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." *United States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988); 18 U.S.C. § 3161(h)(1). Namer's counsel filed a motion to withdraw on October 23 and the judge set a hearing for that motion on December 27. That period is properly excluded under § 3161(h)(1). The district judge then took the period of December 27 to January 5 to find new counsel for Namer, well within the thirty days allowed under § 3161(h)(1)(J).[4]

Second, Namer disagrees with the district court's excluding the time it took for his interlocutory appeal in late 2000 "because the appeal did not actually interfere with any proceedings in the district court." The plain language of 18 U.S.C. § 3161(h)(1)(E), however, excludes "delay resulting from any interlocutory appeal" from the STA calculation. Moreover, the trial does not have to be stayed while the appeal is heard for there to be an exclusion. *United States v. Pelfrey*, 822 F.2d 628, 635 (6th Cir. 1987) (noting that the exclusion for interlocutory appeal is "automatic").

---

[4]Namer seems to be under the mistaken impression that not only must the government provide him–at no cost to himself–an attorney for his defense, but it must also find him that attorney instantly–not an easy task given the complexity of Namer's case and his inability to work with most of the attorneys assigned to him.

The statute does not consider whether the appeal interferes with the district court proceedings, and even if that consideration were a factor, there is ample evidence that Namer's appeal did interfere.

Third, Namer takes issue with the district court's excluding the time from December 14, 2000 to January 16, 2001, that it took for his co-defendant, Fred Smith, to find counsel. The STA provides for the exclusion of "a reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(7). This circuit has made it clear that "under section 3161(h)(7) an exclusion as to one defendant applies to all codefendants." *United States v. Holyfield*, 802 F.2d 846, 848 (6th Cir. 1986). In cases with more than one defendant, there is only one seventy-day clock, which begins when the last defendant appears in court. *United States v. Cope*, 312 F.3d 757, 776-77 (6th Cir. 2002). Namer argues that the exclusion was unreasonable under this statute, but he cites no useful authority for that proposition, and a one-month delay, standing alone, does not seem unreasonable to permit a co-defendant to procure counsel. Furthermore, Namer's argument is doomed by his failure to seek severance of his trial from that of his co-defendant Smith. *See United States v. Culpepper*, 898 F.2d 65, 66 (6th Cir. 1990) ("Where multiple defendants are charged in an indictment and no motion for severance has been granted, only one speedy trial clock governs the action.").

Namer finishes his STA argument with a sweeping assertion that none of the period from September 2000 to August 2001 should be excluded because he was not being adequately prepared for trial during that period. First, much of this time is already properly excluded for reasons stated above. Second, Namer provides no authority for the proposition that time excluded for a defendant to prepare his defense could later be held not to be excludable because the defendant was not really

18

preparing during that time. And finally, this delay was clearly for the benefit of Namer–to provide him appropriate counsel for such a complex case and ample time to review the myriad documents he claims were so crucial to his defense.[5] We hold that all of the time periods that Namer challenges were properly excluded under the STA.

**V.  Testimony of Gabriel Elias**

Although Namer does not seem to dispute the jury's finding that he swindled over $2 million from eighty-six-year-old Gabriel Elias, he argues that the district court erred by allowing Elias to testify about his dealings with Namer because Elias's testimony was based almost entirely on documentation falling within the recorded recollection exception of Fed. R. Evid. 803(5) ("Rule 803(5)"). We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Mack*, 837 F.2d 254, 257-58 (6th Cir. 1988).

Namer argues that Elias's testimony should not have been admitted under Rule 803(5) because Elias lacked present memory of his specific dealings with Namer. This argument is specious; the recorded recollection exception only applies when the witness lacks present memory of the underlying events. *See* Rule 803(5) ("Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately . . . ."). Once it is established that the witness has insufficient memory concerning the matter, the government must show only that the document was "made or adopted by the witness when the matter was fresh in the witness' memory and

---

[5]We hardly need to point out the obvious contradictions running throughout Namer's arguments. He claims his rights were violated because he was not given ample time to meet with lawyers and experts and review documents, but at the same time he complains that his trial did not occur quickly enough.

19

[reflects] that knowledge correctly." Rule 803(5). Namer does not contend that Elias did not properly adopt the documents in question pursuant to Rule 803(5). Clearly the district court did not abuse its discretion by allowing Elias to read his notes into the record under the recorded recollection exception.

## VI.    The Validity Of Namer's Indictment

Namer argues that certain overt acts should have been stricken from his indictment because they constituted separate conspiracies that fell outside the relevant statute of limitations, which requires the defendant to be indicted within five years of the alleged crime. *See* 18 U.S.C. § 3282; *United States v. Lash*, 937 F.2d 1077, 1081 (6th Cir. 1991). The government charged Namer with a single conspiracy beginning in 1994 and lasting until 2000. Namer argues that the district court, as a matter of law, should have found that events occurring before September 28, 1995, (five years before his indictment) were all separate conspiracies (or at least one separate conspiracy involving Namer's dealings with Quackenbush, which occurred prior to September 28, 1995), and thus should have stricken them from the indictment.

Whether multiple or single conspiracies exist is a factual question to be determined solely by the jury. *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990). The government alleged that all the acts were part of one big conspiracy lasting until 2000; the jury found a single conspiracy; and the evidence is certainly sufficient to support that finding. Namer's attempt to treat his relationships with Quackenbush and Fred Smith as separate conspiracies focuses only on the insurance aspect of his scheme and ignores the connection between these two men. Quackenbush, the source of Namer's performance bonds in 1994 and 1995, referred Namer to Fred Smith, the primary insurer of Namer's fraudulent notes thereafter. This was done so that Namer could continue

20

selling fraudulent notes once Quackenbush had been forced out of his position at Universal because of his lying for Namer. Furthermore, long after 1995, investors held and were owed principal and interest on the notes issued with Quackenbush's assistance and fake insurance. New issuances of fraudulent notes were made, at least in part, to compensate past noteholders in order to keep the scheme alive. In other words, the whole pattern of conduct from 1994 to 2000 was a Ponzi scheme whose success depended entirely on future fraudulent sales, and thus provides sufficient evidence for the jury's finding a single conspiracy lasting until 2000.

## VII.    Sufficient Evidence Of Money Laundering

Namer argues that there was insufficient evidence of concealment, promotion, and an agreement to support his conspiracy to commit money laundering conviction under 18 U.S.C. § 1956(a)(1). The standard of review for sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991) (internal quotations omitted). A reviewing court should give the government the benefit of all reasonable inferences and refrain from independently weighing the evidence. *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996). Under this deferential standard, and in light of the evidence presented by the government, Namer's claims are baseless.

### A.    Concealment

The government provided ample evidence that Namer attempted to conceal a specified unlawful activity–in this case, bribery–an element of money laundering under § 1956(a)(1). Namer bribed Quackenbush extensively and went to great lengths to conceal those bribes from Quackenbush's employer, Universal. At their first meeting Namer offered Quackenbush a

21

"friendship envelope" stuffed with cash so that he would not leave a paper trail. When Quackenbush requested a "loan" in order to purchase Neurocrine Biosciences ("Neurocrine") stock, Quackenbush asked Namer to send the check to his home to avoid detection. Namer did not write a check, but instead obtained a cashier's check payable to a third party (Neurocrine). Cashier's checks issued to third parties are evidence of intent to conceal the nature and source of a transaction. *See United States v. Brown*, 53 F.3d 312, 313-14 (11th Cir. 1995). Furthermore, Namer paid a Florida attorney to incorporate RJJJ, a shell company, through which he could funnel bribes to Quackenbush. Namer falsely indicated on the memo line of the checks he wrote to RJJJ that they were for financial consulting services. This use of a "sham" business to make payments to Quackenbush unrelated to his position at Universal is evidence of concealment. *See United States v. Vanhorn*, 296 F.3d 713, 718 (8th Cir. 2002). Finally, Namer paid PNC Mortgage directly for Quackenbush's mortgage so that Universal would not find out, more evidence of concealment of his unlawful bribery to Quackenbush.

The government also presented abundant evidence of Namer's concealment of other bribes. When Namer paid Craig Colwell to market his securities, he paid Colwell directly so that Sutter (Colwell's employer) would not find out, and he tried to make the payments look like loans rather than bribes. The first check to Colwell was not from Namer's account, but was a difficult-to-trace cashier's check for $20,000. Namer listed broker commission fees in the PPM, but deliberately omitted the bribes paid to Colwell. Moreover, Namer also concealed the bribes he paid to Bruce Barbers, another broker. The PPM's for the Ray and Ross, Northstar, and Aircraft Leasing notes all listed the broker's commissions, but not the under-the-table bribe payments to Barbers. Namer sent checks and wired funds directly to Barbers's house and bank account respectively. Namer also

22

wrote on the checks that they were for "consulting work." The government clearly presented sufficient evidence for a jury to find that Namer attempted to conceal his bribes.

### B.     Promotion

The government also presented sufficient evidence that Namer promoted the unlawful activity in violation of § 1956(a)(1). Namer ran a Ponzi scheme, which involved continuing to issue fraudulent notes in order to make the interest payments on prior note issues necessary to keep the investors from discovering the fraud. At first Namer attempted to set up his own brokerage firm with Colwell and Barbers, but when they refused he purchased a one-half interest in the brokerage firm MPR for $2 million (using funds derived from the fraudulent sales of Ray and Ross notes and Northstar notes). Namer then used MPR to sell $7.9 million in Northstar and Aircraft Leasing notes. It is clear that Namer purchased MPR to help continue the Ponzi scheme by selling more notes, and using funds from the specified unlawful activity to perpetuate the scheme constitutes promotion. *United States v. Thorn*, 317 F.3d 107, 133-34 (2d Cir. 2003); *United States v. Masten*, 170 F.3d 790, 797-98 (7th Cir. 1999); *United States v. Godwin*, 272 F.3d 659, 669-70 (4th Cir. 2001). Finally, Namer's promotion of the unlawful activity was made obvious by a memo that Fred Smith sent Namer during the course of his issuance of consents of surety, in which Smith says that his insurance friends had lost interest in Namer's deal because it was "somewhat of a sham" since he "had no intention of ever ordering any final bonds" and "only wanted a piece of paper that would satisfy the lendor [investor]." After Namer received this memo, he continued to obtain from Smith consents of surety and he never ordered any final insurance. This memo is clear evidence that Namer never wanted insurance, only pieces of paper to masquerade as insurance so that he could further promote

23

the Ponzi scheme of selling new fraudulent notes to cover payments on past fraudulent notes. The government presented sufficient evidence of promotion to support the jury verdict.

## C. Agreement

Namer also states in a conclusory fashion that the government never provided any evidence of an agreement to support a conspiracy involving Namer. Nonetheless, six separate witnesses admitted participating in a conspiracy with Namer, including Quackenbush, Colwell, Barbers, and Baresel. Their testimony establishes the existence of an agreement to undertake acts that constitute securities fraud, wire fraud, and mail fraud. Namer mentions the lack of any written agreement, but there is no requirement for a written agreement to prove a conspiracy. *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000). The government certainly presented sufficient evidence of an agreement to support the jury's finding.

## VIII. Evidence Of Sophisticated Investors

Namer argues that the district court erred by granting the government's motion in limine excluding evidence as to whether Namer's victims conducted due diligence before investing with him and whether they were sophisticated "accredited investors" (a term defined under the securities regulations to include certain high-net-worth or high-income individuals). After full briefing the district court determined that such evidence was immaterial and excluded it. We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Mack*, 837 F.2d 254, 257-58 (6th Cir. 1988).

With regard to "accredited investors," Namer argues that the SEC "has decided that these sophisticated investors do not require its protection." *See* 15 U.S.C. §§ 77d, 77e. Nonetheless, the relevant regulation makes clear that transactions exempted from securities requirements because the

24

transactions involve accredited investors "are not exempt from the antifraud . . . provisions of the federal securities laws." Regulation D, Preliminary Note 1. Thus, to the extent Namer argues that the accredited-investor status of his victims was relevant because it would have immunized them from being defrauded, he is wrong. Moreover, because none of the charges against Namer required proof of reliance, the purchaser's investment sophistication is immaterial to Namer's case. *See Wright v. National Warranty Co.*, 953 F.2d 256, 262 (6th Cir. 1992).

Namer also argues that evidence that his victims performed due diligence and discovered no fraud would be relevant evidence that no fraud in fact occurred. The district court rejected this argument, "declin[ing] to permit Defendant to argue that he should escape liability 'on the ground that the other party failed to nose out the truth.'" (quoting *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 529 (7th Cir. 1985)). Moreover, Namer made no proffer below to suggest that his victims actually did reach a conclusion that Namer was not engaged in fraud. In fact, these investors testified at trial that Namer defrauded them into purchasing his notes by using false and misleading statements and omissions. The district court did not abuse its discretion in excluding Namer's questions regarding accredited-investor status and due diligence.

## IX. Sentencing

In a supplemental letter brief, Namer argues that he is entitled to re-sentencing in light of *United States v. Booker*, 125 S. Ct. 738 (2005), in which the Supreme Court held that the mandatory federal sentencing guidelines violated the Sixth Amendment by requiring judges to enhance the sentences of defendants based on facts not found by a jury or admitted by the defendant. To remedy this Sixth Amendment problem, the *Booker* Court excised from the Sentencing Act the provisions making the guidelines mandatory. *Booker* then instructed reviewing courts to apply its Sixth

25

Amendment holding and its remedial interpretation of the Sentencing Act to all cases on direct review. *Id.* at 769. *Booker* further mandated that reviewing courts apply ordinary prudential doctrines, such as plain error review, to determine if re-sentencing is warranted. *Id.*

Namer's sentence was enhanced, pursuant to the mandatory federal sentencing guidelines in place at the time, based on facts found by the sentencing judge, including the amount of loss, Namer's role in the offense, and abuse of trust. Therefore, Namer's sentence violates the Sixth Amendment under *Booker*. Since Namer failed to make a Sixth Amendment objection at sentencing, however, we conduct plain error review to determine if he must be re-sentenced. Under that test, there must be (1) error, (2) that is plain, (3) and that affects substantial rights. *United States v. Oliver*, 397 F.3d 369, 378 (6th Cir. 2005). If these three conditions are met, an appellate court may then exercise its discretion to notice the forfeited error if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

Namer's sentence in violation of the Sixth Amendment constitutes error that is plain. *Id.* at 378-79. Moreover, according to this circuit's precedent in *United States v. Oliver*, a sentence enhancement based on judge-found facts under a mandatory guidelines system necessarily affects Namer's substantial rights.[6] *Id.* at 379-80. Finally, *Oliver* dictates that any sentencing error that

---

[6]Speaking only for myself, I note my disagreement with *Oliver*'s unwarranted departure from traditional plain error review. Despite purporting to apply plain error review, *Oliver* fails even to discuss, much less enforce, the defendant's traditional burden of proving that the district court's error prejudiced him. *Oliver* reasoned that since the defendant received a sentence "beyond that which was supported by the jury verdict and [his] criminal history," he was necessarily prejudiced because he "*arguably* received a sentence that was longer than his sentence would have been absent a Sixth Amendment violation." *Oliver*, 397 F.3d at 379-80 (emphasis added). "Arguably" is not enough, however. Under the ordinary plain error review that *Booker* requires, 125 S. Ct. at 769, a defendant bears the burden of proving that he was prejudiced by the error, *United States v. Olano*, 507 U.S. 725, 734 (1993): i.e., that absent that error, he would more likely than not have received a lower sentence. By simply ignoring this requirement, *Oliver* effectively holds that every Sixth

leads to a violation of the Sixth Amendment by imposing a more severe sentence than is supported by the jury verdict automatically diminishes the integrity and reputation of the judicial system. *Id.* at 380.

Therefore, *Oliver* requires that we remand Namer's case for re-sentencing. Of course, post *Booker*, the district court may impose sentencing enhancements under the guidelines so long as the district court then treats the resulting guideline ranges as advisory rather than mandatory. The court is not bound by its guideline calculations, whatever they may be. Thus, on remand the district court may consider all facts leading to the enhancements it originally imposed in determining what constitutes a reasonable sentence for this defendant in these circumstances under 18 U.S.C. § 3553(a). In other words, in remanding Namer's case for re-sentencing, we in no way mean to imply that the district judge's original sentence (at or near the top of the guideline range for every count) was unreasonable.

## CONCLUSION

Accordingly, we **AFFIRM** Namer's conviction in all respects, but we **REMAND** his case for re-sentencing.

---

Amendment violation in a *Booker*-type case automatically prejudices a defendant, a holding that does not comport with Supreme Court precedent.