RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

            *v.*

JUAN EUGENIO MARRERO,
                    *Defendant-Appellant.*

> No. 08-2075

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 07-00257-001—Paul Lewis Maloney, Chief District Judge.

Argued: January 14, 2011

Decided and Filed: July 6, 2011

Before: KENNEDY, CLAY, and KETHLEDGE, Circuit Judges.

—————————

## COUNSEL

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Matthew G. Borgula, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Matthew G. Borgula, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. Juan Eugenio Marrero, Edgefield, South Carolina, pro se.

KENNEDY, J., delivered the opinion of the court, in which KETHLEDGE, J., joined. CLAY, J. (pp. 27–37), delivered a separate dissenting opinion.

—————————

## OPINION

—————————

KENNEDY, Circuit Judge. Defendant-Appellant Juan Eugenio Marrero was convicted of possessing with intent to distribute crack cocaine and marijuana, for which crimes he was sentenced to 360 months' imprisonment. On appeal, Marrero raises a

plethora of arguments challenging his conviction and sentence. Primarily, he alleges that the district court violated his Sixth Amendment right to an attorney by refusing to appoint him substitute counsel and allowing him to represent himself at trial and sentencing. Because we determine that the district court did not abuse its discretion by denying Marrero's request for a new attorney, and because his remaining claims lack merit, we **AFFIRM**.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of October 2, 2007, Sergeant Paul Kenny of the Grand Rapids Police Department and Michigan State Troopers Bob Watson and Chris Bush went looking for Marrero at an apartment complex in Comstock Park, Michigan. Information gathered in an ongoing drug-trafficking investigation indicated that Marrero was selling cocaine, and the officers wanted to question him. After a resident directed the officers to a particular apartment unit, Sergeant Kenny knocked on the door and Marrero's girlfriend, Tina Walters, answered. Walters told the officers that Marrero was not currently there and gave them permission to come in and look for him. The officers' sweep of the apartment verified that Marrero was not inside, but in the kitchen they found crack cocaine residue, a digital scale, and Marrero's Bridge Card[1] next to an active burner. Surmising that the stove had recently been used to cook crack cocaine, the officers decided to canvass the area for Marrero.

In a common-area laundry room down the hall from the apartment, Trooper Bush discovered Marrero hiding inside of a dryer. Trooper Bush ordered Marrero to emerge, called Trooper Watson into the room, and attempted to handcuff Marrero. At that point, Marrero began to resist arrest by punching and kicking the troopers and trying to run away. In the resulting melee, Marrero—undeterred by multiple stuns from Trooper Bush's taser—managed to pull the troopers into the hall. Sergeant Kenny, who had remained in the apartment to speak with Walters, joined the scuffle upon hearing the troopers' calls for help, and the three officers finally managed to subdue Marrero. The

---

[1] A Bridge Card is a debit card issued by the Michigan Department of Human Services to beneficiaries of its food assistance program.

officers each sustained minor injuries; Marrero emerged with several rug burns on his face, more than a dozen taser stuns, and complaints about pain in his shoulder, which had been injured prior to his encounter with the officers.

Once Marrero was secured, Trooper Bush returned to the laundry room, where he found 27.25 grams of crack cocaine in a washing machine. Police obtained a search warrant for the apartment, from which they recovered a total of 209.54 grams of marijuana in addition to the crack cocaine residue and other evidence found in the kitchen. Meanwhile, Marrero was examined by medical personnel, signed a waiver declining hospitalization, and was provided some water. Approximately half an hour after his arrest, Sergeant Kenny advised Marrero of his Miranda rights and Marrero agreed to speak. During the course of his conversation with Sergeant Kenny, Marrero admitted that: he had fought the officers because he did not want to go to prison; the crack cocaine seized from the laundry room was his; earlier that day, he had purchased $800 of cocaine that he planned to turn into crack cocaine; and the marijuana found in the apartment was his and he intended to sell it. Marrero was placed in state custody.

On November 7, 2007, Marrero was indicted in the United States District Court for the Western District of Michigan on two counts: possession with intent to distribute five or more grams of cocaine base and possession with intent to distribute marijuana, both in violation of 21 U.S.C. § 841(a)(1). A magistrate judge issued a writ of habeas corpus *ad prosequendum* directing the state to surrender Marrero to federal custody. Marrero had his first appearance in federal court on November 15, 2007, and the magistrate judge appointed Attorney Richard E. Zambon to represent him.

After initially pleading not guilty, Marrero pleaded guilty to the crack cocaine charge pursuant to a plea agreement on January 3, 2008. In exchange for Marrero's plea, the Government promised to dismiss the marijuana charge and to decline seeking an enhanced penalty based on Marrero's previous felony drug convictions. The district court scheduled sentencing for April 21, 2008, and directed that a presentence investigation report ("PSR") be prepared. Marrero received the PSR in March of 2008.

On April 14, 2008, Marrero filed a *pro se* letter with the district court purporting to contain the following four motions, reprinted verbatim: "(1) motion to withdraw guilty plea[;] (2) motion for failed to appointment a truth federal public defendar counsel violation of Sixth Ammendment[;] (3) motion for evidentuary hearing for ineffective assistance of councel[;] (4) motion for lock of jurisdiction." Additionally, on April 17, 2008, Marrero filed a *pro se* document titled "petition for writ of habeas corpus and subjiciendum [sic]," which was based on the district court's alleged lack of jurisdiction. The district court considered all of Marrero's motions at a hearing on April 21, 2008, the date scheduled for sentencing. During this proceeding, the district court determined that Marrero wished to withdraw his guilty plea because he wanted "to challenge everything." Marrero's primary contentions seemed related to the district court's jurisdiction—he believed that the federal court lacked jurisdiction over his case because he was originally charged and bound over for trial in the state court—and his potential sentence—he was convinced that a bill introduced in, but not passed by, the United States House of Representatives had eliminated the sentencing disparity between crack- and powder- cocaine offenses. Furthermore, the district court ascertained that Marrero wanted a new attorney because "me and him [Zambon] we don't get along and everything. . . . [W]e always see for different point of view." In particular, Marrero complained that Zambon had pressured him to plead guilty without allowing him to raise the above arguments to the court. He also objected to the fact that Zambon was not an employee of the federal defender's office.

After attempting to explain to Marrero that his jurisdictional and sentencing claims lacked merit, the district court denied his request for substitute counsel, insisting that all of his conflicts with his attorney were based on his "total and complete misperceptions as to what the law is." Nevertheless, the district court allowed Marrero to withdraw his guilty plea, though it denied all of his other motions. A jury trial on both counts of the indictment was scheduled to begin on May 28, 2008. On April 25, 2008, the Government filed a supplemental information listing Marrero's three prior state-court convictions for felony drug crimes, which elevated the statutory mandatory-minimum sentence applicable to the charged offenses.

On May 8, 2008, Zambon filed a motion on behalf of Marrero stating that Marrero wanted to represent himself at trial.  At the district court's hearing on the motion, held on May 16, 2008, Marrero clarified that he wished to proceed without counsel only "[b]ecause I can't get a new lawyer."  In response to the district court's inquiry into the nature of the conflict between Marrero and Zambon, Marrero insisted that "we got a conflict in every point" and "I don't see how I can go in trial and be properly represented while me and my attorney we have a conflict from the day we started."  Specifically, Marrero again complained that Zambon refused to act on his previously raised objections to the district court's jurisdiction and the disparate penalties applicable to crack- and powder-cocaine offenses.  Marrero also objected to Zambon's failure to challenge his indictment before a grand jury, as he believed he had a right to do.  Finally, Marrero expressed dissatisfaction with Zambon's response to his numerous requests for documents related to his case, saying he had belatedly provided him with the police report and did not procure for him the search warrant or the order to transfer him from state to federal custody.

After allowing Marrero to detail his conflict with Zambon, the district court concluded that "99 percent of it, if not a hundred percent of it, goes to [Marrero's] misunderstanding of exactly how the federal system works vis-a-vis the state government."  The district court further explained as follows:

> Mr. Marrero has clearly asked for the appointment of another federal defender or CJA attorney to represent him in this case. And one of the purposes of my inquiring as to whether what [sic] those sources of conflict were to get on the record exactly all of those sources of conflict. And to the extent that there isn't any ambiguity there, the Court would find that based on the alleged conflicts that the defendant has with Mr. Zambon, none of those either singularly or collectively would cause me to discharge Mr. Zambon and give the defendant another court-appointed lawyer, because as I've said before, nearly 100 percent of the alleged conflicts here represents the defendant's fundamental misunderstanding of the law, which Mr. Zambon has clearly correctly provided to the defendant, but he chooses not to accept. So on the record before that we made at an earlier proceeding, and on this record, I would not allow Mr. Marrero to receive another lawyer, because there is no reason to discharge Mr. Zambon in the Court's judgment.

The district court found that Marrero had "knowingly and intelligently and voluntarily waived his right to counsel," and gave him permission to represent himself with Zambon as standby counsel. This arrangement remained in place throughout Marrero's trial and sentencing.

On the eve of trial, May 27, 2008, Marrero filed a "motion to dismiss the indictment." The district court construed the filing as a motion to suppress the 27.25 grams of crack cocaine recovered from the laundry room, the 209.54 grams of marijuana found in the apartment, and Marrero's post-arrest statements to Sergeant Kenny. After holding an evidentiary hearing on these issues the morning of May 28, 2008, the district court denied Marrero's motion to suppress on all grounds.

Marrero's case proceeded to trial on the afternoon of May 28, 2008. The following day, the jury convicted Marrero on both counts of the indictment. On July 23, 2008, Marrero received a revised PSR based on the report prepared in anticipation of sentencing under his guilty plea. He stated two objections to the PSR: first, he contested the calculation of his base offense level under U.S.S.G. § 2D1.1(c)(7), complaining of the sentencing disparity between crack- and powder-cocaine offenses; second, he challenged the application of an obstruction-of-justice enhancement under U.S.S.G. § 3C1.2. The district court sentenced Marrero on August 11, 2008. After overruling his objections, the district court calculated his Guidelines range based on the career-offender provisions of U.S.S.G. § 4B1.1 and imposed a within-Guidelines sentence of 360 months' imprisonment.

Marrero timely appealed his conviction and sentence. Though Zambon initially filed an appearance as Marrero's appellate counsel, this Court granted his motion to withdraw and appointed another attorney to represent Marrero on appeal.

## ANALYSIS

Marrero appeals a number of the district court's rulings affecting his conviction and sentence. First and foremost, he claims that the district court violated his Sixth Amendment right to counsel by refusing to appoint him substitute counsel, essentially

forcing him into the Hobson's choice of proceeding to trial with a counsel he mistrusted or representing himself. Marrero also challenges his conviction based on the denial of his motion to suppress evidence, the admission of testimony at trial describing his fight with police officers prior to his arrest, the Government's use of a police report to refresh the recollection of a trial witness, and the sufficiency of the evidence supporting his conviction. Additionally, Marrero objects to his sentence, alleging that his sentencing hearing was convened in violation Rule 32(e)(2) of the Federal Criminal Rules of Procedure, that his sentence should be vacated and the case remanded under *Kimbrough v. United States*, 552 U.S. 85 (2007), and that a remand for resentencing is warranted in light of the Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372.[2] None of these arguments warrant overturning Marrero's conviction or sentence.

## I.     Sixth Amendment Right to Counsel

Marrero first asserts that the district court "forced [him] to forego counsel and proceed to trial pro-se [sic] against his wishes," thereby violating his Sixth Amendment right to counsel. Although the district court conducted the model inquiry recommended by this Court whenever a defendant seeks to represent himself, and made an express finding that Marrero had knowingly and voluntarily waived his right to counsel, *see United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987), Marrero insisted that "what [he] really wanted [was] a new attorney," not self-representation. Marrero reiterated this objection throughout district court proceedings, when he complained several times that he was "forced to represent [him]self" because the district court did not honor his "need" for a new attorney. *See also* Trial Tr. vol. 2, 145, May 29, 2008, ECF No. 55 ("I don't got no defense, that's why I representing myself right now, because me and my attorney we have some problems . . . ."); Sentencing Hr'g Tr. 2-3, Aug. 11, 2008, ECF No. 56 ("I never wished to in the beginning to represent myself,

---

[2]In a supplemental, *pro se* brief filed with permission of this Court, Marrero raises some additional claims challenging the validity of the search warrant and the federal government's jurisdiction to prosecute him. We need not address those arguments because Marrero is represented by counsel. *See United States v. Martinez*, 588 F.3d 301, 327 (6th Cir. 2009), *cert. denied*, 131 S. Ct. 538 (2010). Additionally, those claims lack merit.

they were basically forced on me. . . . I want an attorney to represent me. I never asked for me to represent myself."). He now renews this argument on appeal.

The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all "critical stages" of the criminal process. *United States v. Wade*, 388 U.S. 218, 224 (1967). This right must be knowingly and intelligently waived by a defendant electing to represent himself. *Faretta v. California*, 422 U.S. 806, 835 (1975). However, the right to counsel does not guarantee that a criminal defendant will be represented by a particular attorney. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). "An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990). "[A] persistent, unreasonable demand for dismissal of counsel and appointment of new counsel is the functional equivalent of a valid waiver of counsel." *United States v. Green*, 388 F.3d 918, 921 (6th Cir. 2004) (internal quotation marks and alterations omitted); *see also King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006) ("[B]y rejecting all of his options except self-representation, [the defendant] necessarily chose self-representation."). Therefore, "[r]esolution of whether [Marrero]'s decision to proceed *pro se* was voluntary hinges on whether [his] objections to [his] present counsel had such merit as to entitle [him] to have new counsel appointed." *United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997).

We review for abuse of discretion the district court's decision that an indigent defendant failed to demonstrate good cause for substitute counsel. *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007). Whether the denial of a request for substitute counsel is an abuse of discretion depends on the following considerations:

> [1] the timeliness of the motion; [2] the adequacy of the court's inquiry into the defendant's complaint; . . . [3] whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense[; and] [4] a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.

*United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996) (quoting *Iles*, 906 F.2d at 1130 n.8). Balancing these factors, we ultimately find that the district court did not abuse its discretion by refusing to appoint a new attorney for Marrero. Therefore, Marrero was not deprived of his Sixth Amendment right to counsel.

### 1.       *Timeliness*

The timeliness of Marrero's requests for a new attorney does not lend strong support to either Marrero's claim or the district court's decision. On the one hand, Marrero did seem to belatedly convey his dissatisfaction with Zambon's representation to the district court. Marrero's original motion for substitute counsel was filed almost fifteen weeks after the entry of his guilty plea—and only five days before his scheduled sentencing date—even though a major source of Marrero's conflict with Zambon was that "[he] never want[ed] a plea bargain" and "[he] want[ed] to take [his case] to trial no matter what." This Court has previously found that a comparable, ten-week delay renders a motion for substitute counsel untimely. *See United States v. Gilliam*, 384 F. App'x 497, 498 (6th Cir. 2010). Marrero made his second request for different representation only two-and-a-half weeks later, when Zambon filed the motion asking the district court to allow Marrero to represent himself. Still, by that time, only three weeks remained before Marrero's trial was scheduled to begin. Again, past decisions of this Court reflect that motions for substitute counsel may be untimely when filed at similar times before a defendant's trial date. *See, e.g.*, *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (two weeks).

On the other hand, when considering both of Marrero's motions, the district court did not express any concerns about their timeliness. Indeed, the district court granted Marrero's motion to withdraw his guilty plea, filed on the same day as his first motion for substitute counsel, even though timeliness is also a factor in this Court's review of those requests. *See United States v. Ellis*, 470 F.3d 275, 281 (6th Cir. 2006) ("This Court considers a number of factors to determine whether Defendant meets the burden of proving that the withdrawal of his guilty plea is for a fair and just reason, including: (1) the amount of time that elapsed between the plea and the motion to withdraw it . . . ."

(internal quotation marks omitted)).  And, while Marrero renewed his request only three weeks before the scheduled trial, this is not a case where the defendant had awaited trial for months without any complaints regarding his representation, only to bring a last-minute motion for substitute counsel.  *Cf. United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (finding untimely a motion for substitute counsel brought one-and-a-half months before trial, when proceedings had progressed slowly and discovery had been complete for nearly one year).  After allowing Marrero to withdraw his guilty plea, the district court scheduled his trial to begin in only five-and-a-half weeks; less than half of this time had elapsed when Zambon, on behalf of Marrero, filed the second motion.

### 2.    *Adequacy of the District Court's Inquiry*

The record of the district court's hearings on Marrero's motion for substitute counsel and the motion requesting self representation suggest that the district court adequately inquired into the source of Marrero's conflict with Zambon.  This Court's prior decisions indicate that, to meet this requirement, the district court simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it.  *See United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) ("The record demonstrates that the district court engaged in multiple lengthy discussions with both [the defendant] and [his attorney] that span many transcript pages regarding their alleged conflicts.  During these exchanges, [the defendant] had ample opportunity to discuss in detail his complaints regarding [his attorney] and respond to [his attorney]'s representations regarding their relationship."); *Chambers*, 441 F.3d at 447 ("It appears to us that the district court allowed [the defendant] adequate opportunity to explain his concerns and allowed counsel to respond."); *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004) ("Our review of the sentencing hearing shows that the district court . . . allowed [the defendant], his defense counsel, and the prosecutor the opportunity to address the complaint at issue.  We conclude that this inquiry was adequate because it allowed all of the interested parties to present their respective evidence and arguments.").

At the first hearing, the district court allowed Marrero to go on at length about his differences of opinion with Zambon as to his plea bargain. About eight pages of the transcript of the second motion hearing are dedicated to the district court's attempts to nail down the nature of Marrero's dissatisfaction with Zambon. This included questions about the extent to which the conflict affected Marrero's ability to defend his case. Zambon also got the chance to voice his opinions. After the district court concluded its inquiry, it acknowledged that "I've tried as best I can to get on the record exactly what the natures of the dispute here are," and later noted that "one of the purposes of my inquiring as to whether what [sic] those sources of conflict were to get on the record exactly all of those sources of conflict." Thus, it appears from the record that Marrero had the chance to fully describe his objections to Zambon's representation, and the district court satisfied its obligation to determine the sources of his complaint.

This conclusion is unaffected by the fact that, at the second motion hearing, the district court launched into an inquiry as to whether Marrero was equipped to represent himself, *see McDowell*, 814 F.2d at 250, after it allowed Marrero to describe his conflict with Zambon. The record reflects that the district court appreciated that the motion to proceed *pro se*, filed by Zambon, was actually motivated by Marrero's desire for a new attorney. *See* Mot. Hr'g Tr. 22, May 16, 2008, ECF No. 51 ("Mr. Marrero has clearly asked for the appointment of another federal defender or CJA attorney to represent him in this case."). The district court denied that request. *Id.* ("[O]n the record before that we made at an earlier proceeding, and on this record, I would not allow Mr. Marrero to receive another lawyer, because there is no reason to discharge Mr. Zambon in the Court's judgment."). If we conclude that the district court did not abuse its discretion in this regard, it was perfectly acceptable to leave Marrero with the choice of proceeding with Zambon as counsel or opting for self representation. *See United States v. Eltayib*, 88 F.3d 157, 168 (2d Cir. 1996) ("Because the denial of [the defendant]'s request for new counsel was proper, it was also proper to explain to [the defendant] that he was thus left with only two options: keeping this lawyer or proceeding *pro se*.").

### 3.     *Nature of the Conflict Between the Attorney and the Client*

After determining the nature of the conflict between Marrero and Zambon, the district court could have concluded that it was not "so great that it resulted in a total lack of communication preventing an adequate defense." *Jennings*, 83 F.3d at 148.  To be sure, Marrero clearly indicated to the district court that he disagreed with Zambon's strategy for defending his case. *See, e.g.*, Mot. Hr'g Tr. 6, May 16, 2008, ECF No. 51 ("Me and him [Zambon], we got a conflict in every point, so if I have a conflict on every point with my attorney, so I don't see how I can go in trial and be properly represented while me and my attorney we have a conflict from the day we started, so that's not fair.").  Nonetheless, a defendant's differences of opinions with his attorney do not create a complete breakdown of communication that compromises his defense.  This Court has previously emphasized that a defendant's "dissatisfaction with the responses he got from his lawyer, not with the lack of opportunity or his inability to talk to his lawyer or contact his lawyer," does not establish a total lack of communication. *Salvidar-Trujillo*, 380 F.3d at 278 (internal quotation marks and alterations omitted).  Moreover, a lack of communication resulting from a defendant's refusal to cooperate with his attorney does not constitute good cause for substituting counsel. *Vasquez*, 560 F.3d at 468.

In this case, the district court found that "nearly 100 percent of the alleged conflicts here represents the defendant's fundamental misunderstanding of the law, which Mr. Zambon has clearly correctly provided to the defendant, but he chooses not to accept."  Given Marrero's descriptions of his problems with Zambon, this factual finding is not clearly erroneous.  Marrero never expressed concern about his ability to consult with Zambon about his case.  Instead, Marrero believed that Zambon should be pursuing a number of meritless arguments, despite Zambon's and the district court's numerous attempts to explain why Marrero's concerns were groundless. Marrero's most significant complaint—that Zambon had somehow tricked him into pleading guilty—was accommodated by the district court when it allowed Marrero to withdraw

his plea.  After granting that request, it was reasonable for the district court to conclude that Marrero's remaining objections did not merit substitution of counsel.

### *4.     Prompt and Efficient Administration of Justice*

The balance between Marrero's right to the counsel of his choice and the public's interest in the prompt and efficient administration of justice is, at most, equivocal, and perhaps even favors Marrero.  From the district court's perspective, "nearly 100 percent of the alleged conflicts [between Marrero and Zambon] represents the defendant's fundamental misunderstanding of the law."   Therefore, the district court may have reasoned, "[g]ranting [Marrero's] request for substitute counsel . . . would actually have impeded the efficient administration of justice because his complaints about his attorney's performance were frivolous."  *Saldivar-Trujillo*, 380 F.3d at 278; *see also United States v. Pittman*, 11 F. App'x 521, 526 (6th Cir. 2001) (noting that defendant has "little legitimate interest in obtaining new counsel" when "the court [finds] that the dispute [the defendant had] with his counsel was such as he would likely have had with any counsel").

However, the district court proceedings undercut this line of reasoning.  It is difficult to see how granting either of Marrero's requests for a new attorney would have caused any additional delay in his case.  Because the district court decided Marrero's first motion for substitute counsel at the same time it permitted him to withdraw his guilty plea, this disposition coincided with a necessary rearrangement of the district court's schedule for Marrero's case.  It was not as if Marrero requested new counsel in the middle of trial, at the expense of great time and effort already put forth by the Government.  *Cf. United States v. Sullivan*, 431 F.3d 976, 982 (6th Cir. 2005) (finding that "the record does not reflect that the prompt and efficient administration of justice would have been served by the substitution of counsel and the attendant continuance such a substitution would have required," when defendant brought his motion five days after the Government rested in a jury trial involving forty-two government witnesses). When Marrero elected to proceed *pro se* just three weeks before the scheduled trial date, the district court saw no need to grant a continuance.  If three weeks was sufficient for

Marrero, a layperson, to get ready for trial, a trained attorney should also have had adequate time to prepare the case without additional delay.  If anything, it seems efficiency concerns would counsel the appointment of substitute counsel, rather than risk "the possibilities of delay and confusion that are inherent in a *pro se* trial." *United States v. Bertoli*, 994 F.2d 1002, 1018 (3d Cir. 1993).

### 5.     *Conclusion*

In sum, neither the timeliness of Marrero's requests for substitute counsel nor consideration of the public interest dictate the district court's proper course of action for ruling on Marrero's request for new counsel.  We conclude that the adequacy of the district court's inquiry into Marrero's complaints and the nature of the conflict between Marrero and Zambon tip the scales toward a conclusion that the district court did not abuse its discretion.  Therefore, the district court did not violate Marrero's Sixth Amendment rights.

## II.     Motion to Suppress

Marrero next appeals on several grounds the district court's denial of his motion to suppress the drugs recovered from the apartment and laundry room, as well as his statements to police officers after his arrest.  "When reviewing the district court's decision regarding a motion to suppress, we review its factual findings for clear error and its legal conclusions *de novo*." *United States v. Hughes*, 606 F.3d 311, 315 (6th Cir. 2010) (emphasis added) (internal quotation marks omitted).  Because the district court denied Marrero's motion, we consider the evidence in the light most favorable to the Government. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc).

### A.     Basis for Arrest and Detention

Marrero first contends that there was no basis to detain and arrest him, and therefore the drugs subsequently recovered and his statements to police should be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). Essentially, Marrero alleges that, upon finding him hiding in the laundry room, the police immediately arrested him without probable cause.  Consequently, he

asserts, all the evidence subsequently obtained by the police is tainted by this Fourth Amendment violation.

The Government argues that Marrero did not raise this issue in the district court, so our consideration of it is confined to, at most, plain error review. *See United States v. Caldwell*, 518 F.3d 426, 430 (6th Cir. 2008) ("[T]here is some debate over whether we should treat a suppression argument raised for the first time on appeal as a waiver (subject to review only if defendant can show "good cause"), or a forfeiture (subject to "plain error" review) . . . ." (citations omitted)). However, a careful reading of the record reveals that Marrero did allude to these issues in the district court: his motion complains that police lacked an "order for arrest" when they arrived at the apartment complex on October 2, 2007, and at the suppression hearing Marrero again argued that the officers were not "justified" in arresting him. Given the leniency courts afford *pro se* litigants, *see, e.g.*, *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005), we consider this claim preserved.

Nevertheless, Marrero's claim fails on the merits, as the record reflects that Marrero's arrest met the standards of the Fourth Amendment. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959); *see also Beck v. Ohio*, 379 U.S. 89, 91 (1964). When the officers arrived at the apartment complex on the evening of October 2, 2008, they were acting on information, obtained from individuals arrested earlier that day, that Marrero had sold those individuals crack cocaine. After receiving consent from an apparent resident to search the apartment where they believed Marrero was staying, they observed crack cocaine residue and a digital scale next to still-hot burner. Marrero was then discovered hiding from the officers in the apartment building's laundry room, inside of a dryer. At this point, the officers reasonably believed that Marrero had been engaged in the manufacture of crack cocaine, giving

them probable cause for arrest. If these facts alone were not sufficient, Marrero then began fighting the officers in an attempt to escape, providing further justification for his arrest. Therefore, the district court did not err in concluding that probable cause supported Marrero's arrest and detention.

### B.    Search of the Premises

Marrero next contends that the search of the premises after his arrest "clearly exceeded that necessary," and so the crack cocaine recovered from the laundry room and the marijuana seized from the apartment should be suppressed. In essence, Marrero claims that the officers searched the apartment before they obtained a search warrant, that they searched the laundry room without obtaining a warrant at all, and that neither search fell within any exceptions to the warrant requirement.

As an initial matter, the Government challenges Marrero's standing to object to a search of either the apartment or the laundry room, arguing that he lacked a legitimate expectation of privacy in either space. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."). The district court agreed with respect to the laundry room, reasoning that it was a common area of the apartment complex. The district court's finding that the laundry room was accessible to the public is not clearly erroneous, and it did not err in admitting the crack cocaine the police found hidden in a washing machine. *See United States v. Dillard*, 438 F.3d 675, 682-83 (6th Cir. 2006) ("[The defendant] did not have a reasonable expectation of privacy in the common hallway and stairway of his duplex that were unlocked and open to the public.").

As for the search of the apartment, the Government points to Marrero's repeated statements in the district court denying that he was living there, *see, e.g.*, Trial Tr. vol. 2, 302, May 29, 2008, ECF No. 55 (accepting jury instruction submitted by the defense stating that "[t]he defense says the drugs did not belong to him and he did not live at the apartment in question, and he was never in the laundry room"), as evidence that he lacked the requisite expectation of privacy in the apartment. *See Minnesota v. Carter*,

525 U.S. 83, 90-91 (1998) (holding that defendants had no legitimate expectation of privacy in, and thus could not challenge the search of, another's dwelling which they had visited only for the commercial purpose of bagging cocaine). The district court did not determine whether Marrero was actually living in the apartment, and we are hesitant to rule on this issue without the benefit of a factual finding on this point. Regardless, the district court did find that the relevant search and seizure of the marijuana occurred after the police secured a valid search warrant. This conclusion is not clearly erroneous, and the district court did not err in its decision that the seizure of the marijuana complied with the Fourth Amendment.

## C.    Voluntariness of Statements

Finally, Marrero contests the admission of his post-arrest statements, claiming they were given involuntarily. *See Oregon v. Elstad*, 470 U.S. 298, 304-05 (1985). Specifically, Marrero claims that police questioned him when he was "unable to fully and knowingly participate in any conversation" due to the fact that he had been stunned with a taser multiple times during his struggle with police officers. While a statement is involuntary, and thus inadmissible, when "obtained by 'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will,'" *id.* at 304 (quoting *Haynes v. Washington*, 373 U.S. 503, 515, 514 (1963)), the officers in this case did not question Marrero under coercive circumstances. Officer Kenny's testimony at the evidentiary hearing reflects that, prior to questioning, Marrero was given water and the opportunity to rest. Furthermore, Marrero was examined by medical personnel, and he declined to go to the hospital. Based on the evidence presented, the district court found "no evidence whatsoever of coercion or threats or other force being used by the police officers to adduce a statement from the defendant." Thus, the district court did not err by refusing to suppress Marrero's statements to police as an involuntary confession.

Marrero also challenges the admissibility of his confession under *Miranda v. Arizona*, 384 U.S. 436 (1966). After *Miranda*, "[s]tatements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant

has first been apprized [sic] of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003). Marrero alleges that he was questioned by police before being given the *Miranda* warnings. However, at the suppression hearing, Officer Kenny testified that he administered the *Miranda* warnings to Marrero before questioning began. As a result, the district court determined that "the defendant was given his Miranda warnings by the officer [and] he waived his rights to speak to the officer without the benefit of [a] lawyer." This factual finding is not clearly erroneous.

Alternatively, Marrero claims that "the record shows that [Marrero] has difficulty with the English language, thus there is a real possibility that Appellant did not understand [his *Miranda*] rights." Marrero did not pursue this argument in the district court, and it finds no support in the record. Marrero had sufficient knowledge of the English language to represent himself throughout trial and sentencing, which fact belies the assertion that he was unable to comprehend the *Miranda* warnings. The admission of Marrero's post-arrest statements did not violate *Miranda*.

## III.     Testimony Regarding Marrero's Struggle with Police

Marrero next asserts that the district court erred by allowing the arresting officers to testify about their struggle with Marrero when they found and tried to detain him. According to Marrero, this testimony constituted character evidence of "other crimes, wrongs, or acts," and is therefore inadmissible under Rule 404(b) of the Federal Rules of Evidence. Because Marrero failed to object to this issue at trial, we review it for plain error under Rule 52(b) of the Federal Rules of Criminal Procedure. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009). To establish plain error, Marrero must show an "error" that was "clear or obvious," that "affected [his] substantial rights," and that "'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). "Meeting all four prongs is difficult, as it should be." *Id.* (internal quotation marks omitted).

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). "Where the challenged evidence is 'intrinsic' to, or 'inextricably intertwined' with evidence of, the crime charged, Rule 404(b) is not applicable." *United States v. Henderson*, 626 F.3d 326, 338 (6th Cir. 2010). That is:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

*United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000).

The circumstances under which police officers apprehended Marrero are inextricably intertwined with evidence of the possession crimes with which he was later charged. *See Henderson*, 626 F.3d at 338. Marrero's attempt to hide from police officers inside a dryer, the officers' discovery of Marrero, and the ensuing struggle all have a temporal connection to, and completes the story of, the charged offense. *See Hardy*, 228 F.3d at 748. Therefore, it was not error, let alone plain error, for the district court to allow the admission of this evidence.

## IV.     Use of a Police Report to Refresh a Witness's Recollection

Marrero also challenges the district court's overruling of his objection to the Government's use of a search warrant tabulation report to refresh the recollection of a witness, Officer Danielle Brennan. Marrero argues that the court erred by allowing Officer Brennan to refresh her recollection with the report because it "was not made by her, nor was it adopted by her." "We review for abuse of discretion the district court's evidentiary rulings." *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004). That is, we will overturn a ruling on the admissibility of evidence only if the district court "committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors[,] . . . improperly applie[d] the law[,] or use[d] an erroneous legal standard." *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002) (internal

quotation marks omitted).  Additionally, "[r]eversal is appropriate only if the abuse [of discretion] was not harmless error," that is, only if the erroneous evidentiary ruling affected the outcome of the trial.  *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007) (internal quotation marks omitted).

Rule 612 of the Federal Rules of Evidence authorizes a party to refresh a witness's memory with a writing so long as the "adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness." Fed. R. Evid. 612.  By its terms, Rule 612 does not limit the type of writings that might be used as refreshers, and "[t]he propriety of permitting a witness to refresh his memory from a writing prepared by another largely lies within the sound discretion of the trial court." *Rush v. Ill. Cent. R.R. Co.*, 399 F.3d 705, 716 (6th Cir. 2005).  The fact that the warrant tabulation report was prepared by a person other than Officer Brennan does not establish that the district court abused its discretion by allowing her to refresh her recollection with it.

Furthermore, even if the district court erred by allowing Officer Brennan to refresh her recollection with the warrant tabulation report, any error is harmless.  Officer Brennan's refreshed testimony concerned where police had located the crack cocaine in the laundry room of the apartment complex.  Specifically, she testified that the officers at the scene had found the crack cocaine in "[t]he far right washing machine."  At trial, the Government presented testimony of another officer, Trooper Chris Bush, that police recovered a quantity of crack cocaine from inside a washing machine in the laundry room.  *See* Trial Tr. vol. 1, 120, May 28, 2009, ECF No. 54 ("[I]n the first dryer there, I opened it up or the first washing machine, I opened it up and looked down inside and I observed to me [sic] a large amount of crack cocaine, what I believed to be crack cocaine.").  Allowing Officer Brennan to confirm this testimony would be at most harmless error.

## V.     Sufficiency of the Evidence

Marrero also challenges his conviction as based on insufficient evidence, claiming that the Government did not prove that he had possession of the drugs recovered in the case or that he had the requisite intent to distribute the drugs. Though Marrero moved for a directed verdict at the close of the Government's case, he did not renew this motion at the close of all proofs. "[W]here, as here, a defendant does not renew his motion for judgment of acquittal for insufficiency of the evidence at the close of all the proofs, appellate review is limited to determining whether there was a manifest miscarriage of justice." *United States v. Childs*, 539 F.3d 552, 558 (6th Cir. 2008) (internal quotation marks omitted). "Such a miscarriage of justice occurs only if the record is devoid of evidence pointing to guilt." *Id.*

The record in this case is certainly not devoid of evidence of guilt, and includes testimony from the interrogating police officer relaying Marrero's admissions that: the crack cocaine that police found in the laundry room was his; he had recently purchased $800 worth of cocaine from his supplier; he had cooked crack cocaine in the apartment about twenty minutes prior to the police's arrival; and the marijuana found in the apartment was his and he intended to sell it. Additionally, a DEA drug expert testified that the amount of illegal drugs recovered in the case amounted to distribution quantities. Given this evidence, Marrero's conviction does not amount to a manifest miscarriage of justice.

## VI.     Rule 32 Violation

Marrero next appeals the district court's refusal of his request at sentencing for more time to review his PSR. Marrero argues that, because he represented himself at sentencing, he should have been given more time to review the PSR and navigate the "technical, complicated matters" that comprise the federal sentencing system. *See also* Sentencing Hr'g Tr. 7, Aug. 11, 2008, ECF No. 56 ("I didn't have no time to work on [objections to the PSR]. I'm not professional. I don't know what to do with this stuff. I needed time to work on it, and they would not send it to me . . . ."). We review the

denial of a motion for a continuance for abuse of discretion.  *United States v. Roberge*, 565 F.3d 1005, 1011 (6th Cir. 2009).

Rule 32(e)(2) of the Federal Rules of Criminal Procedure provides that the probation officer must give the PSR to the defendant and his or her attorney "at least 35 days before sentencing unless the defendant waives this minimum period." Fed. R. Crim. P. 32(e)(2).  "This court has made it clear on several occasions that the district courts must be in literal compliance with the requirements of Rule 32." *United States v. Carter*, 374 F.3d 399, 408 (6th Cir. 2004) (internal quotation marks omitted), *vacated on other grounds*, 543 U.S. 1111 (2005).  "Yet, although we emphasize the importance of Rule 32's mandate, we review violations for harmless error." *Roberge*, 565 F.3d at 1011. Remand is required unless the error "did not cause the defendant to receive a more severe sentence." *United States v. Lanesky*, 494 F.3d 558, 561 (6th Cir. 2007) (internal quotation marks omitted).

Marrero received his PSR on July 23, 2008, twenty days before his sentencing on August 11, 2008.  Thus, the district court was not in strict compliance with Rule 32(e)(2).  However, Marrero did not identify to this Court, or to the district court, any specific prejudice that he suffered from the court's refusal to grant a continuance.  In the district court, Marrero stated two objections to the PSR: an (erroneous) contention that federal law did not contain a disparity between the punishments imposed for drug crimes involving crack and powder cocaine and an objection to the imposition of a reckless-endangerment enhancement.  He does not allege that his ability to argue these objections was negatively affected by his inability to prepare, nor does he point to any additional objections that he could have brought if given more time; neither does he challenge the accuracy of any facts recounted in the PSR. *See United States v. Turner*, 134 F. App'x 17, 22 (6th Cir. 2005) ("Actual prejudice is established by showing that a continuance would have made relevant witnesses available or added something to the defense." (internal quotation marks omitted)); *United States v. Archer*, 70 F.3d 1149, 1151 (10th Cir. 1995) ("Because defendant does not assert contradictory facts that challenge the

accuracy of the PSR, he suffered no prejudice from the Rule 32 violation, and it would be meaningless to remand for resentencing." (internal quotation marks omitted)).

Furthermore, Marrero had received a prior version of his PSR four months earlier, when he was awaiting sentencing after pleading guilty. That PSR was identical to the operative PSR, save for adjustments to account for the withdrawal of his plea and the filing of the Government's supplemental information. *Cf. United States v. Burke*, 187 F.3d 638 (6th Cir. 1999) (unpublished table decision) (concluding that ten-day period to review revised PSR was reasonable, and violation of Rule 32's thirty-five-day-review requirement harmless, when "changes contained in the Revised PSR were technical, not substantive"). Given these facts, Marrero has not shown that strict compliance with Rule 32(e)(2) would have resulted in a different sentence, and the district court's violation of Rule 32(e)(2) amounted to harmless error.

## VII.     Procedural Objection to Sentence

Marrero also challenges his sentence, arguing that the district court failed to appreciate its authority "to disagree with the 100:1 crack[-to-powder-]cocaine sentencing ratio[]"[3] incorporated in the Guidelines. [Appellant's Br. 23.] Marrero relies on *Kimbrough v. United States*, 552 U.S. 85 (2007), which held that a district court may vary a defendant's sentence upon concluding that "the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case," *id.* at 110. *See also Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840, 843-44 (2009) (per curiam) ("[D]istrict courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."). Though Marrero was sentenced under the career-offender provisions of U.S.S.G. § 4B1.1 rather than the drug-quantity table of U.S.S.G. § 2D1.1, the sentencing disparity between crack and powder cocaine offenses is "implicitly incorporated" in his career-

---

[3]In fact, by the time of Marrero's sentencing, the Guidelines had been amended to reduce the 100:1 disparity for most crack cocaine offenses. *See* U.S.S.G. app. C, amend. 706. Nevertheless, it is clear that Marrero's argument "applies with equal force to sentencing decisions under the new crack-cocaine Guidelines," and remand is warranted if the district court did not understand that it "may categorically reject and vary from the new Guidelines based on policy disagreements with those Guidelines." *United States v. Johnson*, 553 F.3d 990, 996 (6th Cir. 2009).

offender enhancement. *United States v. Michael*, 576 F.3d 323, 327 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 819 (2009). Therefore, the logic of *Kimbrough* and *Spears* still applies, and a "categorical disagreement with the [crack-to-powder-cocaine] ratio may . . . support a district court's rejection of the career offender enhancement." *United States v. Curb*, 625 F.3d 968, 972 (6th Cir. 2010). Marrero claims that the district court did not understand its authority to categorically disagree with the crack-cocaine Guidelines, making his sentence procedurally deficient. *See Moore v. United States*, 555 U.S. 1 (2008) (per curiam); *United States v. Johnson*, 553 F.3d 990, 996 (6th Cir. 2009).

In the proceedings below, Marrero repeatedly contested the application of the crack-cocaine disparity to his sentence. However, Marrero never argued to the district court that it should impose a downward departure based on a categorical disagreement with the Guidelines. Rather, he only argued for a downward departure based on his mistaken belief that Congress had eliminated the contested disparity. Additionally, Marrero responded negatively when, at the close of the sentencing hearing, the district court asked him whether he had "any other objections to the sentence . . . imposed." As a result, we review his request for remand under a plain-error standard. *See United States v. Simmons*, 587 F.3d 348, 354-58 (6th Cir. 2009) (determining that plain-error review applied to defendant's procedural argument for remand in light of *Kimbrough*, even though defendant's counsel at sentencing had "devoted much of her argument [at sentencing] to the idea that a downward variance was warranted . . . because of the Guidelines' disparate treatment of crack and powder cocaine offenses" and had, when asked if she had additional objections, raised a vague objection to the "procedural, substantive aspects" of defendant's sentence), *cert. denied*, 130 S. Ct. 2116 (2010). *See generally United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc); *United States v. Bostic*, 371 F.3d 865, 872-73 (6th Cir. 2004).

As this Court previously held in *Michael*, "the district court's error, if any, in failing affirmatively to recognize its discretion to reject the statutory 100:1 ratio as implicitly incorporated into U.S.S.G. § 4B1.1 was not plain." 576 F.3d at 328 (citing *United States v. Liddell*, 543 F.3d 877, 885 (7th Cir. 2008)). In this case, the district

court explicitly recognized that "the guidelines are advisory to the Court." It also discussed its consideration of the 18 U.S.C. § 3553(a) factors, explaining the basis for Marrero's sentence in light of "the very serious nature of his offenses," his "likelihood to recidivate" and penchant for "deceitful and exaggerating representations," his need for "anger management help" and "drug education," and the necessity of deterrence and protection of the public. As in *Simmons*, "[t]here is simply no indication whatsoever that the judge believed the Guidelines were mandatory, or that the court believed it was not free to vary downward based on both particularized circumstances of the crime and defendant or based on substantive disagreement with the crack Guidelines." 587 F.3d at 364; *cf. Johnson*, 553 F.3d at 996 & n.1 (remanding "so that the district court may impose a sentence with full awareness" of its authority under *Spears*, when the district court stated at sentencing that it "must" apply the Guidelines and this Court had "no way of ascertaining whether the district judge would have imposed the same sentence if he had known of his discretion to vary categorically from the crack-cocaine Guidelines based on a policy disagreement"). *But see Curb*, 625 F.3d at 973 (distinguishing *Simmons* and remanding for resentencing under *Johnson*). Under these circumstances, "we cannot say the district court's explanation constitutes an error, let alone an error that 'was obvious or clear,' affecting the defendant's substantial rights and calling into doubt 'the fairness, integrity, or public reputation of the judicial proceedings.'" *Simmons*, 587 F.3d at 365 (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)).

## VIII.   Fair Sentencing Act of 2010

In a supplemental brief, Marrero asserts that he is entitled to the benefit of the Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372. Marrero was convicted of possessing 27.25 grams of crack cocaine. At the time of his sentencing and by reason of his prior convictions, this offense carried a ten-year mandatory minimum sentence and a maximum sentence of life imprisonment; the Fair Sentencing Act amends these penalties to a thirty-year maximum sentence with no mandatory minimum sentence. Though Marrero's 360-month sentence does not exceed the maximum sentence assigned to his offense by the Fair Sentencing Act, Marrero nevertheless argues that we should

remand his case for resentencing with reference to the adjusted penalties now reflected in § 841(b).

In *United States v. Carradine*, 621 F.3d 575 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 1706 (2011), this court determined that the Fair Sentencing Act's penalty provisions do not apply to offenses committed prior to their enactment, *id.* at 580 ("The new law at issue here, the Fair Sentencing Act of 2010, contains no express statement that it is retroactive nor can we infer any such express intent from its plain language. Consequently, we must apply the penalty provision in place at the time [the defendant] committed the crime in question.").  Because *Carradine* is a prior published opinion of this court, we are bound by its pronouncement that the Fair Sentencing Act has no bearing on Marrero's case.  *United States v. Greer*, No. 07-3687, 2011 WL 693231, at *3-4 (6th Cir. Feb. 28, 2011).  Therefore, a remand for resentencing under the amended penalty provisions of § 841(b) is inappropriate.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Marrero's conviction and sentence.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. The majority is mistaken in its conclusion that there was no Sixth Amendment violation in this case. A fair reading of the record makes clear that Defendant was denied the assistance of counsel at his criminal trial, and therefore his sentence and conviction should be vacated and the case remanded. Because the majority refuses to recognize the district court's constitutional error, I respectfully dissent.

**BACKGROUND**

On November 7, 2007, a federal grand jury indicted Defendant with one count of possession with the intent to distribute crack cocaine and one count of possession with the intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1). Defendant, who is uneducated and indigent, requested counsel, and the district court thereafter, on November 16, 2007, appointed attorney Richard E. Zambon to represent Defendant. After initial pleas of not guilty, Defendant pleaded guilty on January 3, 2008 to one count of possession with the intent to distribute crack cocaine in exchange for the government's promise to dismiss the remaining count. The district court scheduled a sentencing hearing for April 21, 2008.

Over the next few months, the relationship between Defendant and counsel broke down to such a degree that Defendant pleaded with the district court to assign him a new attorney. On April 13, 2008, Defendant filed a *pro se* motion that requested the appointment of new counsel, as well as permission to withdraw his guilty plea. At a hearing on April 21, 2008, Defendant again requested new counsel, explaining that he and his lawyer "don't get along" and that his lawyer has failed to adequately represent him by, for example, misinforming him about matters relevant to his guilty plea. The district court did not find good cause for substitution of counsel, and informed Defendant categorically that he was "not going to get another attorney." The district court did, however, permit Defendant to withdraw his guilty plea, even though the court

determined that Defendant's desire to withdraw his plea was based on a misunderstanding of the law. In considering Defendant's requests to substitute counsel and withdraw his guilty plea, the district court never suggested that the timeliness of either request was of concern to the court.

The district court did not set a trial date at the hearing on April 21, 2008, but instead gave the government nearly a week to file supplemental documents to establish a prior conviction. On April 25, 2008, the same day the government filed its supplemental documents, the district court issued a scheduling order that set a trial date of May 28, 2008.

On May 8, 2008, Defendant's counsel filed a motion stating that Defendant wished to proceed without counsel. The district court considered the motion at a hearing on May 16, 2008, during which Defendant again requested new counsel. The court found that Defendant had a fundamental misunderstanding of the law, and therefore dismissed his concerns about his counsel as meritless. The court advised Defendant that he would not be assigned a new attorney, and presented him with the Hobson's choice of either proceeding with the counsel he neither desired nor trusted, or proceeding with no counsel at all. Although Defendant answered with continued pleas for new counsel, in direct response to the district court's leading questions, Defendant stated that he would rather represent himself than be represented by attorney Zambon.

With that, the district court led Defendant blindly down the road to self-representation by summarily converting the proceedings into a *Faretta* hearing, by which the court sought to extract a knowing and voluntary waiver of counsel. *See Faretta v. California*, 422 U.S. 806, 835-36 (1975) (holding that prior to permitting a defendant to proceed without counsel, "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'") (internal quotation marks and citation omitted). Concluding that Defendant "has knowingly and intelligently and voluntarily waived his right to counsel," the district court permitted counsel to withdraw, but ordered that Defendant's original counsel remain as standby counsel.

Defendant, now proceeding without counsel, appeared at a pretrial conference on May 27, 2008, and complained that he had been "forced to represent myself." The district court summarily dismissed Defendant's contention. The case proceeded to trial on May 28, 2008, during which Defendant again complained that he did not have an attorney. On May 29, 2008, a jury found Defendant guilty of both counts charged in the indictment. On August 11, 2008, following a hearing in which Defendant remained unrepresented by counsel and objected on that basis, the district court sentenced Defendant to 360 months of imprisonment.

## DISCUSSION

No fair reading of the record suggests that Defendant ever desired to represent himself, and as is clear from the trial transcript, he was neither prepared nor equipped to do so. This is not surprising; as the late Justice Frank Murphy once explained:

> The constitutional right to assistance of counsel is a very necessary and practical one. The ordinary person accused of crime has little if any knowledge of law or experience in its application. He is ill prepared to combat the arsenal of statutes, decisions, rules of procedure, technicalities of pleading and other legal weapons at the ready disposal of the prosecutor. Without counsel, many of his elementary procedural and substantive rights may be lost irretrievably in the intricate legal maze of a criminal proceeding. Especially is this true of the ignorant, the indigent, the illiterate and the immature defendant.

*Canizio v. People of the State of New York*, 327 U.S. 82, 87 (1946) (Murphy, J., dissenting). Given the severity of the felony charges against Defendant, one of which carried a possible life sentence, the district court's conduct fell below that which would be expected in the face of pleas for assistance from the court for appointment of substitute counsel. *See Johnson v. Zerbst*, 304 U.S. 458, 462 (1938) (stating that the right to counsel is "one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty").

The Sixth Amendment guarantees a criminal defendant the right to the assistance of counsel. *See, e.g.*, *Kansas v. Ventris*, 129 S. Ct. 1841, 1844-45 (2009). Although an indigent defendant under our case law does not have a right to counsel of choice, the

Sixth Amendment requires the substitution of appointed counsel upon a showing of good cause. *See United States v. Iles*, 906 F.2d 1122, 1130-31 (6th Cir. 1990).

We review the denial a motion to substitute appointed counsel for an abuse of discretion. *See, e.g.*, *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007); *Wilson v. Mintzes*, 761 F.2d 275, 287 n.20 (6th Cir. 1985); *Morton v. Foltz*, 782 F.2d 1042 (6th Cir. 1985) (per curiam) (table). As the majority recognizes, a reviewing court should consider the following factors in determining whether the denial of a request for substitute counsel is an abuse of discretion:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

In this case, based on the application of these factors, we should find that the district court committed a clear error of judgment in denying Defendant's motion to appoint substitute counsel. Recognizing that a district court has wide discretion in this regard, it is clear, based on the record, that no reasonable application of these factors would support the majority's decision to affirm the decision of the district court. I now turn to the factors.

### A.    Timeliness of the motion

The majority simply concludes that the timeliness of Defendant's motion to substitute counsel "does not lend strong support to either Marrero's claim or the district court's decision." (Maj. Op. at 9.) As explained below, the majority's imprecise and equivocal conclusion finds little support in the record.

This is not a case where Defendant sought to substitute counsel on the eve of or during trial. *Cf. United States v. Orris*, 86 F. App'x 82, 88 (6th Cir. 2004) (finding that the district court did not abuse its discretion in denying a motion to substitute counsel

on the last day of trial).  Nor is this a case where Defendant made a second or successive motion for new counsel after the district court previously appointed substitute counsel. *Cf. United States v. Staten*, 181 F. App'x 151, 154 (3d Cir. 2006) (affirming denial of request to substitute counsel, where district court had "already granted [the defendant] substitute counsel once"); *United States v. Davis*, 181 F.3d 104 (6th Cir. 1999) (table) (denying request to substitute counsel, where the defendant claimed an "irreconcilable conflict with his third appointed attorney").

Instead, this is a case where the district court's actions suggest that Defendant's request for a new lawyer was not untimely.  No trial date had been set.  The district court granted Defendant's contemporaneous motion to withdraw his guilty plea, and provided the government nearly a week to file supplemental documents, at which point the district court then issued a scheduling order setting a trial date for May 28, 2008.  To the extent the majority is correct in observing that Defendant "did seem to belatedly convey his dissatisfaction with" his counsel to the district court, (Maj. Op. at 9), such a fact should have no bearing on our analysis because the district court never raised any concerns about the timeliness of Defendant's request for new counsel.

To the contrary, the district court's contemporaneous decision to grant Defendant's motion to withdraw his guilty plea suggests that Defendant's motion to substitute counsel was not untimely.  Timeliness is an important factor in determining whether to permit withdrawal of a guilty plea, *see United States v. Selva*, 43 F.3d 1473 (6th Cir. 1994) (table), yet the district court gave no indication that timeliness was a concern in that regard.  The court simply reasoned that if Defendant "wants the benefit of having a trial, we are going to give him one."  There is no reason why timeliness would weigh against Defendant's motion to substitute counsel when it did not weigh against his contemporaneous motion to withdraw his plea.

Accordingly, the timeliness of Defendant's motion to substitute counsel weighs in his favor.

###     B.     Adequacy of the district court's inquiry

The district court's inquiry into the factual basis for Defendant's request for a new lawyer was inadequate, and the majority's finding to the contrary is flawed. Although the district court inquired into the initial source of the conflict, and perhaps, as the majority states, allowed Defendant to "go on at length about his differences of opinion with [his then-counsel] as to his plea bargain," (Maj. Op. at 11), the district court did not take the additional and critical step of exploring whether the attorney-client relationship had broken down due to a complete lack of trust and confidence. To the extent the district court purported to engage in an independent inquiry, its inquiry was of questionable value because the court seemed to rely heavily on the statements of Defendant's former counsel without also properly considering the surrounding circumstances and contentions of Defendant. The evidentiary value of the statements of Defendant's former counsel are suspect in this case because Defendant disputed the quality of his former counsel's legal representation and specifically stated that he and his attorney had a "conflict from the day we started."

The district court never considered whether Defendant might have better understood the law had it been explained to him by a lawyer who may have been able to establish some measure of effective communication with Defendant, or with whom he may have been able to develop trust and confidence. The court failed to make sufficient inquiry into the working relationship between attorney and client; whether the apparent collapse of this relationship was exacerbated by factors unrelated to Defendant's apparent misunderstanding of the law; and whether the collapse of the relationship, whatever the source, affected Defendant's ability to mount an adequate defense. *See, e.g.*, *United States v. Adelzo-Gonzales*, 268 F.3d 772, 777 (9th Cir. 2001) ("Before ruling on a motion to substitute counsel . . . , a district court must conduct such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern.") (internal quotation marks and citation omitted). Instead of exploring these important questions, and the reasons for any lack of rapport between attorney and client, the district court summarily converted the proceeding into a *Faretta* hearing in which it marched

Defendant unknowingly down the road to self-representation, where Defendant would be forced to confront significant and complex criminal charges without an attorney to represent him.

Although Defendant stated at various times that he wished to proceed without counsel, these statements were in direct response to well-articulated, leading questions posed by the district court in an apparent effort to extract Defendant's waiver of his right to counsel. Any purported acquiescence to proceeding *pro se* was extracted by the district court only after the district court presented Defendant with a false choice of either: 1) proceeding with the counsel he did not desire or trust; or 2) proceeding without any counsel at all. *Cf. United States v. Namer*, 149 F. App'x 385, 394-95 (6th Cir. 2005) (noting that in response to a defendant's request to substitute counsel, the district court fashioned a "reasonable compromise" by elevating a second chair counsel to first chair, but keeping the objectionable lawyer on the case).

Even after Defendant selected the latter choice simply to rid himself of counsel he regarded as unsatisfactory and deficient, he continued to protest "that what I really wanted is a new attorney." (5/16 Hear'g Tr. at 21.) The prosecutor apparently recognized this as a problem, stating, "Your Honor . . . I have some concerns about what he is really asking for. He's mentioned at least three times now that he wants a new attorney." (*Id*.) Although we have held that "by rejecting all [] options except self-representation," a defendant "necessarily [chooses] self-representation," *King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006) (petition for writ of habeas corpus), this rule cannot apply in a case where, as here, the district court abused its discretion by unreasonably limiting a defendant's options.

Accordingly, the district court's inquiry into the matter was woefully inadequate and misleading. This factor thus weighs in favor of Defendant.

###### C.     Extent of conflict between attorney and client preventing an adequate defense

The extent of the conflict between Defendant and counsel was significant, and this factor weighs in Defendant's favor.  Although the record should have been better developed, the record that does exist reveals a complete breakdown of the attorney-client relationship.  *See, e.g.*, *United States v. Jennette*, 387 F. App'x 303, 307-08 (4th Cir. 2010) (finding an abuse of discretion, where district court denied a motion to substitute counsel two weeks before sentencing in the face of a breakdown in communication between lawyer and client).  This is evident from Defendant's statements to the district court,[1] as well as those of his then-attorney.[2]

The magnitude of the conflict is further evidenced by Defendant's decision to *entirely* forgo representation rather than be represented by his then-counsel, even though Defendant was admittedly ignorant of the law and desired a lawyer.  *See United States v. Lagunas*, 48 F.3d 1229 (9th Cir. 1995) (table) (finding an abuse of discretion, where court denied substitution even though the "evidence established a breakdown in communication that made an adequate defense highly improbable, if not impossible").  Although Defendant was permitted the opportunity to consult his former counsel as standby counsel at trial and sentencing, this is at most marginally relevant to the present issue.  Defendant was not permitted any choice in the selection of his standby counsel, nor does the record suggest that Defendant and standby counsel had a meaningful or productive relationship.  They instead continued to have a conflicted relationship compelled by the district court.

---

[1](*See, e.g.*, 5/16 Hear'g Tr. at 3 ("He hasn't been doing anything for me."); *id.* at 8 ("You know what – Excuse me, I ask you for the new attorney . . . . And see he – Me and him, we got a conflict in every point, so if I have a conflict on every point with my attorney, so I don't see how I can go in trial and be properly represented while me and my attorney we have a conflict from the day we started, so that's not fair."); *id.* at 11 ("I never want to plea bargain.  [My lawyer] knows since the beginning me and him we argue from the date that we were talking about that.  I want to take it to trial no matter what."); 4/21 Hear'g Tr. at 20 ("[M]e and him we don't get along and everything.  We see – we always see for different points of view.").)

[2](*See, e.g.*, 5/16 Hear'g Tr. at 2 (stating that Defendant was "suffice it to say, unhappy with my strategy, my plans for trial," and would rather represent himself than continue with his current counsel).)

**D.    Public interest in the prompt and efficient administration of justice**

The final factor is the prompt and efficient administration of justice. This factor weighs in Defendant's favor. The majority does not disagree, but again, as with its analysis of the timeliness issue, the majority provides an imprecise evaluation of the issue, stating simply that the factor "is, at most, equivocal, and perhaps even favors Marrero." (Maj. Op. at 13.) Such an ambiguous conclusion is supported by neither the record nor common sense. In fact, the majority's reasoning suggests that this factor weighs in Defendant's favor even though the majority is loathe to admit as much.

As an initial matter, substitution of counsel when it was requested would not have caused any meaningful delay. Defendant first requested a new lawyer on April 13, 2008, nearly two weeks before the district court would issue a scheduling order on April 25, 2008 for trial on May 28, 2008. Although the district court did not relieve counsel until two weeks before trial, if two weeks were sufficient for an uneducated defendant, proceeding *pro se*, to prepare for trial, then a new attorney certainly would have been able to prepare within that time frame as well. If this were not the case, the district court's way of proceeding would raise serious constitutional questions about whether the district court provided Defendant sufficient time to prepare his defense.

Even if substitution of counsel would have resulted in meaningful delay, the record does not suggest that any such delay would have prejudiced the relevant public interest: no trial date had been scheduled; the court permitted Defendant to withdraw his plea of guilty; and the court adjourned proceedings for nearly a week to permit the government to file supplemental papers. The record likewise does not suggest any prejudice whatsoever to the government. *Cf. United States v. Sullivan*, 431 F.3d 976, 982 (6th Cir. 2005) (affirming denial of request to substitute counsel that was filed "after the Government had presented the testimony of forty-two witnesses and had rested its case, and after the district court had denied [a] motion for judgment of acquittal").

To the extent that the relevant public interest is implicated, it weighs in Defendant's favor. If the district court had appointed substitute counsel, the public would have benefitted from the efficiencies inherent in a trial where both parties are

represented by counsel.  *See, e.g.*, *United States v. Bertoli*, 994 F.2d 1002, 1018 (3d Cir. 1993) (recognizing "the possibilities of delay and confusion that are inherent in a *pro se* trial").  Substitution of counsel might also have abrogated the need for appeal of this issue.  *See, e.g.*, *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 167 (11th Cir. 1997) (noting the courts of appeals' interest in judicial efficiency, particularly because "the caseload of the federal courts of appeals has grown faster than that of any other component of the federal judiciary").

Accordingly, the public interest in the expeditious administration of justice was not aided by the district court's denial of substitution of counsel in this case.  This factor weighs heavily in Defendant's favor.

### E.     Weighing the relevant factors for abuse of discretion

Although the Sixth Amendment does not guarantee an indigent defendant the right to counsel of choice, *see Mooneyham*, 473 F.3d at 291, a straight forward application of the factors discussed above should compel the conclusion that the district court abused its discretion in denying substitution of counsel, thus depriving Defendant of his Sixth Amendment right to counsel.  *See, e.g.*, *United States v. Bell*, 516 F.3d 432, 445 (6th Cir. 2008) (noting that the abuse of discretion standard does not deprive this Court of meaningful appellate review even in areas of "substantial deference").

Any fair reading of the record makes clear that the district court committed a clear error of judgment in denying Defendant's motion to substitute counsel.  This is not merely because the district court misapplied the law.  Rather the district court so unreasonably and egregiously misapplied the law that its decision cannot be excused even under our most deferential standards of review.

Since the deprivation of the right to counsel in violation of the Sixth Amendment is a "structural error," we presume prejudice and should set aside Defendant's conviction and sentence on this basis.  *See, e.g.*, *United States v. Gonzales-Lopez*, 548 U.S. 140, 152 (2006).

## CONCLUSION

For the reasons discussed above, Defendant's conviction was obtained in violation of the Sixth Amendment.  Because the majority erroneously concludes to the contrary, I respectfully dissent.[3]

---

[3]Because a finding of a Sixth Amendment violation would require us to reverse Defendant's conviction, this dissent does not reach the other claims of error raised on appeal and rejected by the majority, other than to note, with regard to Defendant's challenge to his sentence, that the district court appears to have committed serious procedural error.  It is undisputed that the district court failed to insure that Defendant was provided with the pre-sentence report "at least 35 days before sentencing" as required by Rule 32(e)(2) of the Federal Rules of Criminal Procedure.  Defendant objected on this basis at the sentencing hearing, and the district court recognized the error, but proceeded with the hearing anyway. (*See* Sentencing Tr. at 7.)  The district court thereafter stated that Defendant's ignorance of federal sentencing law was "one of the hazards of representing yourself."  Perhaps so, but the district court's non-compliance with the Federal Rules of Criminal Procedure should not also be such a hazard.